## Meade v. Commonwealth.

(Decided April 30, 1929.)

208

W. A. DAUGHERTY and CAUDILL & TACKETT for appellant.

J. W. CAMMACK, Attorney General, and GEORGE HUNT MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

On their joint trial for the murder of Townsel Martin, Buck Layne was acquitted and Irvine Meade was convicted of manslaughter and his punishment fixed at 21 years' imprisonment. Meade appeals.

Briefly stated, the facts are these: The homicide took place late one Sunday afternoon on or near the premises of appellant. Earlier in the afternoon a crowd of men, who were more or less intoxicated, had gone down the road past appellant's home, and at a point 300 or 400 yards away they discharged their pistols. Responding to the spirit of the occasion, appellant went to the back of his premises and discharged his pistol twice. Later on the deceased, Townsel Martin, went down the road past the home of appellant. While there he fired his pistol. He then examined and reloaded his pistol, which

was a .38 special, with the aid of a lighted match. After that he and Ollie Rice got on his horse and rode back up the road towards appellant's home. On reaching appellant's home Rice jumped off the horse and they called for appellant. Appellant and Buck Layne responded to the call and joined Martin and Rice. After engaging in a general conversation, appellant started towards the house. According to Rice, Martin said, "Hold on, Irvine, come back, we want to make friends before you go in the house." Meade said, "I am satisfied, I have already made friends," and went into the house. Martin turned around and rode back to where Layne and Rice were talking. Layne took hold of the horse's bridle and was standing there talking to Martin. Meade then came out of the house with his pistol under his arm. He threw his pistol on Martin, who was talking to Buck Layne at the time. Rice said, "Irvine, don't do that." Martin started to look around, and as he turned in the saddle Meade fired two shots. Martin was hit in the right side. Though Martin had been carrying his pistol in his hand as he approached appellant's home, he did not have it in his hand at the time. It was under his belt. Several shots were fired and at the first shot Layne fell. The horse ran down the road and Martin fell off. According to Layne, Martin wanted to know who was shooting there. Layne replied that Meade had fired two shots. He and Rice walked back off the place and began talking. In a few minutes he started towards Martin. His mule was hitched near by, and he "aimed" to get his mule and go home. He wanted Townsel to go with him, as Townsel was drinking. Just as he started back he heard some one say, "Dont't do that." He thought it was Irvine Meade. He looked for him and could not see him. As he turned and looked towards Ollie Rice, he was struck by the first shot and fell to the ground. He did not know what happened after that. Appellant's account of the affair is as follows: Rice and Layne were standing down below the house talking. Martin rode to where they were. He joined them, and Rice said Townsel was going to kill Buck. Buck said to Townsel: "You know you wouldn't shoot me—I ain't even got a pocketknife." Townsel said, "You God damn liar, I will shoot you." Rice said, "Lord have mercy on our kids." Appellant said, "We'll run," and they both started to run. His wife was screaming. He then turned and told Rice to go down and get Townsel off. Rice said: "By God, I'm afraid to go. You

go. You and him has been good friends.'' He then turned around and started towards the house. When he got there Buck Layne was shot down. He then ran to the right side of Buck. Townsel lifted up his revolver. He said, ''Don't do that, Townsel.'' Townsel swung round in the saddle and said: ''God damn you, Irvine, any one don't fool with me a minute. I'll blow you in two.'' He jumped backwards, got tangled up in some brush or something against the fence. When he arose he got his gun and went to shooting. He fired four shots. There were five or six shots fired. He did not know how many Townsel fired.

It is first insisted that the court erred in the admission of evidence. In this connection our attention has been called to several instances where it is claimed leading questions were propounded to the witnesses. We have carefully examined the record on this point. In some instances the questions were withdrawn. In other instances the matters inquired about played no important part in the case, and it can hardly be said that the method of examination was so prejudicial as to require a reversal of the judgment.

Particular complaint is made of the fact that the witness Caudill was permitted to testify that a copper jacket bullet was taken from the horse of the deceased, and that this bullet entered the back of the horse and was extracted from the lower part of his belly. The ground of the complaint is that it was not shown that appellant had copper jacket bullets, or that his pistol carried bullets of that kind. On the contrary, the evidence was uncontradicted that appellant's pistol would not carry copper jacket bullets, and that he used nothing but leaden balls. It is further argued that the evidence as to where the ball entered and was extracted from the horse showed that it could not have been done by appellant. Of course, all this evidence bore on the question as to who fired the various shots, and was clearly admissible for the purpose of giving the jury a complete picture of the situation. Not only so, but even if its admissibility were less doubtful, it is not perceived how it could have prejudiced appellant's rights in any way. On the contrary, the very argument made in support of its exclusion is most convincing that its admission operated to the advantage of appellant.

Instruction No. 3 is as follows: "If the jury finds the defendant, Irvine Meade, guilty of the crime described in either instruction No. 1 or No. 2, but do not find the defendant Buck Layne, guilty of aiding, assisting and abetting the said shooting as described therein, you will find defendant, Irvine Meade, guilty and the defendant, Buck Layne, not guilty." This instruction is assailed on the ground that it carried with it a suggestion that the jury might properly find appellant guilty and Layne not guilty. Doubtless it would have been better to have used the same language with respect to both defendants, but in view of the fact that the court in instruction No. 5 told the jury in plain and unambiguous language that, if they had a reasonable doubt from the evidence as to the guilt of either of the defendants, they should find him not guilty, it is clear that the language employed in instruction No. 3 could not have exercised any improper influence on the jury.

The instruction on self-defense contains the following: "And that it reasonably appeared to defendants or either of them at the time he so acted that the only means of warding off or escaping said danger, or to them apparent danger, was to shoot and wound said Martin, you will acquit the defendants, or the one to whom such danger was so apparent upon the grounds of self-defense and apparent necessity." It is suggested that, although appellant was at his home where he had a right to be, the language referred to imposed upon him the duty to run away before he was justified in firing at the deceased. The instruction does not in terms or by necessary implication give effect to the idea that appellant should have resorted to flight before firing at the deceased. It simply adheres to the well-established rule that the law does not permit one to take the life of another except as a last resort. Daugherty v. Commonwealth, 157 Ky. 348, 163 S. W. 453.

Another ground urged for a reversal is that the court failed to define the terms "sudden affray," "sudden heat of passion," and "willfully and feloniously." It is the better practice, of course, to define these terms, but it has long been the settled rule in this state that a failure to do so is not prejudicial error. Such was the ruling in Gibson v. Commonwealth, 226 Ky. 186, 10 S. W. (2d) 646, where the court failed to define the term "sudden affray." In Rucker v. Commonwealth, 171 Ky. 276, 188 S. W. 369, and Renaker v. Commonwealth, 172 Ky. 714,

189 S. W. 928, the same rule was applied to a failure to define the words "willfully and feloniously."

Another error relied on is improper argument by the commonwealth's attorney. The first statement complained of is the following: Coming up the road Irvine Meade said: "I will shoot Anthony Hall at the first opportunity. That was the man that punched his brother with a pistol." Evidently counsel was referring to the testimony of Ollie Rice to the effect that Irvine Meade said, "his brother hit my brother with a pistol, and he might just as well hit him as his brother." The only purpose of the argument was to show that there was feeling between appellant and the deceased on account of an altercation which had taken place between the brothers. The fact that in the heat of the argument counsel referred to appellant's statement as having been made with reference to Anthony Hall could not have played any important part in the case.

Our attention is also called to the fact that the attorney for the commonwealth used the following language: "The bullet taken out of the horse was a 32.20 bullet, the same kind of a gun that Meade had." On objection by appellant the court said: "The jury will remember the evidence about that. It is in the record." Even if the statement was not absolutely correct, the situation was one where there was a sharp dispute as to the evidence respecting the type of the weapon used by appellant, and we think that the admonition of the court was sufficient to remove any improper impression caused by the language referred to.

Still another statement complained of is the following: "I will agree with Meade that he was the worst man then and he is the worst man today that you will ever be called upon to try." It is insisted that this was an attack on appellant's character although no witnesses went upon the stand to testify. In a sense this is true, but as one witness testified that appellant said to her, "I am the worst d—— s— of a b—— ever seen Salisburry," and another that he said to him, "I'm the worst G— d—— man ever seen Salisburry," it hardly can be said that the remark of the attorney for the commonwealth was not justified by the evidence.

Other alleged improper statements of the attorney for the commonwealth are relied on, but as they do not appear in the bill of exceptions, they cannot be con-

sidered. Bruner v. Commonwealth, 225 Ky. 713, 9 S. W. (2d) 1080.

On the whole we find no error in the record prejudicial to the substantial rights of appellant.

Judgment affirmed.