# House v. Commonwealth.

Dec. 3, 1940.

Franklin P. Stivers, Judge.

C. R. Luker for appellant.

Hubert Meredith, Attorney General, and William F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

A. B. House was accused of the crime of detaining Myrtle Amburgy, a girl 15 years of age, against her will for an immoral purpose. Section 1158 of the Statutes. His first trial resulted in a hung jury. He was found guilty on his second trial and his punishment fixed at two years in the Reformatory; hence this appeal.

House insists that (1) the court erred in refusing to direct a verdict in his favor at the conclusion of the

Commonwealth's evidence, and also at the conclusion of all the evidence; (2) the verdict is palpably and flagrantly against the evidence, and against the law and the evidence; (3) the trial court permitted incompetent evidence over his objection and exception; (4) he was entitled to a new trial on the ground of newly discovered evidence; (5) the trial court improperly instructed the jury; and (6) the proof did not sustain the indictment as to age.

House denied committing the offense with which he was charged, and denied also that he was present at the scene of the alleged crime. The testimony of Myrtle Amburgy, her father, and her sister, Betty, age 12, placed House at the scene of the crime in London at or about the time it was alleged to have been committed. There is conflict, however, in the testimony of the father and Betty as to the direction in which House went after the alleged offense. The only testimony as to the commission of the offense, other than a bit of testimony given by the father, to which we will later refer, was given by Myrtle. Her story is that sometime between 6:30 and 7:30 in the evening of August 19, 1939, she and her two younger sisters left their home to go to the home of Payton Lovelace for the purpose of collecting some money owing her for work. Lovelace's testimony corroborates this story in that he said that the two younger girls were at his house around 7:30. Myrtle said that she stopped at a corner about a block off of Main Street. Her reason for not going on was that she had on her everyday dress and it was dirty. There is a street light at this corner, there is a drug store (Begley's) near by and there are three houses very near to it. Myrtle said that she knew House, that he passed her and that he spoke and she spoke, and then he asked her where she was going and she said, ''Home,'' (the younger girls had gone on ahead at this time), and that he started around and came back and took hold of her. As to what was supposed to have been said and done to her, the girl testified:

> ''He offered me money to go out with him, and said he would go up town and get some more, and he wanted me to go skating with him and then he said that he would want to have a little bit, and so after a while I got away from him. He had hold of me and he pulled me down in his lap and set there, and

> as he pulled me down in his lap I got up somehow and he had ahold of one of my arms and I got the other loose and then as I jerked away I stumbled and went on out to Westbrooks and I went on out there toward them and I was going in there and he hollowed for me back and I was going to Westbrooks and I met my father coming."

House offered testimony of the court reporter who took down the evidence on the first trial to the effect that Myrtle did not testify on that trial as to certain improper advances made by House as she did on the second trial.

The father testified that he saw his daughter at the time House was said to have detained her, and that she was a short distance from the corner where Begley's store was located. He said that he had gone to meet his children after learning that they had gone to the Lovelace home. In answer to the question, "How long had he known House?" he said, "I seen him for a year, I guess." He said that he was within 30 or 40 steps of House when he noticed a little girl fall on the sidewalk and that at first he did not know that it was his daughter. As indicated above, House testified that he was not at the scene of the alleged offense. He testified also that he had been away from London for about a year except for about two weeks prior to the time of the alleged crime. Several of his witnesses testified that they had seen him, or been with him, during the afternoon and early evening of August 19th. Some of these witnesses testified that House was not out of their sight long enough to have gone from where they were to the scene of the alleged offense.

Since the first two grounds urged for reversal look primarily to the sufficiency of the evidence, we will discuss them together. Is the verdict flagrantly and palpably against the evidence? We think not. The case is a close one, but we have frequently pointed out that the credibility of the witnesses is for the jury. Hale v. Commonwealth, 283 Ky. 841, 143 S. W. (2d) 720, and cases cited therein. Should our holding be otherwise, it would be necessary for us to disregard the evidence of Myrtle Amburgy. This we are not prepared to do. The members of the jury saw the parties and heard the evidence, and it was for them to determine its weight.

The complaint as to incompetent evidence is directed toward the following question: "You say that he told you at that time that he wanted to have intercourse with you? A. Yes, sir." There was an objection to this question, which was overruled. An exception was taken. It is insisted that this was a very leading question, and under the circumstances was highly prejudicial to appellant's substantial rights. Granting that the question was improper, we fail to see how it could have been substantially prejudicial to House, in view of the fact that the foregoing quotation from Myrtle's testimony leaves no doubt that the effect of what she said was that House wanted to have sexual intercourse with her.

One phase of the alleged newly discovered evidence was that James Gray, the arresting officer, said in his affidavit that he had to point out House to Myrtle's father before the arrest was made. This, of course, would only be contradictory of the father's testimony that he had known House for about a year. Another phase was that two parties gave affidavits to the effect that they passed the corner where Myrtle was and that there was no one with her. This evidence was merely cumulative and contradictory of Myrtle's testimony as to the alleged offense. The alleged newly discovered evidence does not meet the requirements of Subsection 6, Section 271 of the Criminal Code of Practice. Hale v. Commonwealth, 283 Ky. 841, 143 S. W. (2d) 720.

The first point as to improper instructions is that the court should have defined the words "feloniously," "unlawfully," and "willfully." We have frequently said, however, that this is not necessary, though desirable. Meade v. Commonwealth, 229 Ky. 207, 16 S. W. (2d) 1016; Vance v. Commonwealth, 254 Ky. 667, 72 S. W. (2d) 43.

It is next insisted that, since there was evidence as to a scuffle at the scene of the alleged offense, there should have been an instruction on assault and battery. Muncy v. Commonwealth, 274 Ky. 746, 120 S. W. (2d) 389. Here we have the testimony of House that he not only did not commit the alleged offense, but also that he was not present at the place where it was said to have occurred. There was no evidence warranting such an instruction. Muncy v. Commonwealth, supra. See also Paynter v. Commonwealth, 55 S. W. 687, 21 Ky. Law

Rep. 1562. Stanley's Instructions to Juries, Section 966.

It is admitted that the indictment follows substantially Section 1158 of the Statutes, but that, since it charged that House was over 21 years of age, the Commonwealth should have been required to offer proof as to his age. The statute makes no mention of age, and, furthermore, House said on cross examination that he was 30 years of age. This point appears to us to be groundless.

Finding no error prejudicial to the appellant's substantial rights, it is our conclusion that the judgment must be and it is affirmed.