## Murrell v. Commonwealth.

June 5, 1942.

John S. Deering for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

On November 3, 1941, appellant and Mary Robinson were charged in a true bill with the murder of Paul Ketron; on separate trial he was found guilty, the jury inflicting the death penalty. Judgment was entered accordingly; motion for a new trial overruled; two grounds are urged for a reversal: First, the court erred in refusing to empanel a jury to inquire into the state of mind of appellant, it being claimed that he was insane at the time of the homicide. Second, the court erroneously overruled motion for a continuance.

At about 4:30 a. m., June 25, 1941, Andrew Hemphill, night policeman of Nicholasville, had information that appellant, at some point in Jessamine County, had killed Hershell Anderson, and that he could be located at the home of Mary Robinson. Hemphill went to the police station where he found policeman Ketron, and the two started for the Robinson home. As they came near the place Ketron suggested that he go to the rear of the house for fear that Murrell, if there, might escape. He went through the alley and Hemphill drove around to the front. He knocked on the door and called for Mary Robinson, and informed her that he was looking for Murrell; she came to the door and told the officer that Murrell was not there. While they were talking Hemphill heard a pistol shot. He immediately went to the rear, saw Ketron struggling, but he was dead when Hemphill undertook to raise him. The bullet which caused Ketron's death entered just left of the middle of

the forehead ranged down to the right and was found lodged against the back of the skull.

Lula Frye was in the Robinson home the night of the homicide. She said that some time around four o'clock Murrel came to the house, knocked and when Mary went to the door Murrell said, "I want you to go with me." "While Mary was looking for her shoes, Mr. Hemphill knocked and asked if Henry was there, saying 'he had shot a man out on the road.'" About this time Murrell went to the middle room and she saw no more of him, but heard a shot; before the shot she heard a voice that sounded like Ketron's call "Get back."

Calvin Johnson lived in the neighborhood; he heard a shot and saw Murrell leaving the Robinson house by way of the alley. The deputy jailer testified that shortly before the trial Murrell asked him to call Dean, the sheriff, and later he and Dean went back to the jail and Murrell, speaking to the sheriff, said that he had shot Ketron. This statement was voluntary. Dean said that when he went to the jail, by invitation, Murrell said, "I want to talk to you about this case; must I plead guilty or not?" The sheriff replied, "I don't know whether you are guilty or not," whereupon Murrell said, "I haven't got any witnesses or money, and I don't know whether to plead guilty or not," and the sheriff said, "that is left entirely up to you."

Murrell did not testify. His mother testified that she lived in Washington County. In support of the claim of insanity she said that Murrell's father, in the year 1915, had shot himself near a river bank, and his body had been discovered by the son; that after that he never seemed right; had said that he was going to kill himself "like daddy." At one time he had killed a horse and thought it was a joke. He was sent to Lakeland when he was about ten years old, where he remained for two and a half years. When he returned he was better for a while, but later began to steal, at one time taking an automobile. He was fifteen then and continued to be incorrigible. He would talk to himself at times. He had been married, and his wife was killed about three years ago in an automobile accident, after which he acted queerly. She thought he was crazy, though she could control him and he was "nice to me." He had been sent to the penitentiary for stealing an automobile, remaining for nearly two years, later returned for violating parole on

account of a housebreaking charge, though the mother insisted that he was innocent of the latter charge. Other witnesses testified as to his peculiar characteristics, and expressed the beliefs that he was mentally unsound.

Dr. Kimball, Superintendent at Lakeland, produced the record showing that Murrell was brought to that institution from Nelson County on July 10, 1917. The statistical sheet gave his history, showing date of present attack, June 1, 1917; diagnosis, "dementia praecox." Dr. Voorhies had signed the statistical sheet, but was not available as a witness. Dr. Kimball gave quite a lengthy definition of paranoic type, dementia praecox, its characterizations and the common effect. The doctor never examined Murrell, but during the trial had "moved up there purposely to observe; to look at him." He was asked a question, based on statement detailed: "Would you say this man was a person of sound or unsound mind?" and replied, "Well, the symptoms you have enumerated could be attributed to dementia praecox, but I have not examined the man."

In rebuttal an ex-sheriff of Washington County who said that he had known Murrell for fifteen years and had seen and conversed with him frequently, expressed the opinion that he had a sound mind. Another officer had known him for twenty years; had seen him and talked to him often, and thought his mind was good. Dr. Williams examined Murrell a short while before the trial. He carried on a conversation with appellant and found him to be intelligent, and, as he thought, of sound mind. The jailer, who had charge of appellant from the 8th of August to the time of trial, saw nothing in his demeanor during that time to indicate that he was mentally unsound. Dr. Neal examined Murrell in July, and again shortly before the trial. His opinion was that appellant was of sound mind.

It is first to be observed that all the testimony introduced in appellant's behalf was from lay witnesses, with the exception of Dr. Kimball, who expressed no opinion, and from observation, some at rather remote periods, expressed the opinion that appellant was mentally unsound. On the other hand, we have lay witnesses who had observed the actions of appellant at more or less remote periods, who were of the opinion from his actions that he was mentally sound. In addition, there was the testimony of two doctors.

The evidence of former commitment, at a time when appellant was about ten years of age, competent and perhaps persuasive, was not conclusive as to his condition of mind at the time of the commission of the act. Southers v. Com., 209 Ky. 70, 272 S. W. 26, citing Miller v. Com., 197 Ky. 703, 247 S. W. 956. The question here was merely whether or not appellant, at the time of the homicide had sufficient reason to know what he was doing, or to know right from wrong, or had not sufficient mental power to govern or control his actions. Miller v. Com., 236 Ky. 448, 33 S. W. (2d) 590. This was an issue to be decided by the jury as is any other issue of fact. Miller case supra, citing Maulding v. Com., 172 Ky. 370, 189 S. W. 251. The jury, under an appropriate instruction, determined this the only defensive issue, against the appellant.

The joint indictment was returned on November 3, 1941. The two defendants were arraigned on the same day and appellant filed affidavit setting out his physical condition, and saying he was without funds, asked the court to afford him the services of a physician for purpose of examination. There was also a motion for continuance; this being supported by affidavits of appellant and counsel who were that day appointed, setting up facts which indicated lack of time for preparation. The court continued the hearing until the 10th day of November. In the meantime the court had appointed Dr. M. C. Pentz, who examined appellant and reported in writing that he found appellant complaining of pain in his arm, perhaps due to a bullet wound which had caused some paralysis; appellant complained of inability to stand erect, but witness could find no apparent reason for such condition. He found him to be "normal and well oriented as to time and place and physically able to attend court and undergo trial."

When the case was called on the 10th, appellant again moved for continuance. The attorneys who had been appointed on the day of arraignment said, by affidavit, they had gone to the jail to see and converse with appellant (and Mary Robinson), but due to stress of circumstances were unable to obtain a proper history of the case, but learned the names of two persons who were likely to be witnesses; due to other engagements they were unable to ascertain what some of the prospective witnesses would testify, nor did they know where they could be

located. They asserted that they were handicapped in their investigation because of the prevalence of more or less of a "mob spirit," and they believed if given until the following term they would be enabled to formulate a defense. There was no evidence of undue excitement during trial. Counter-affidavits were filed undertaking to show that counsel had ample time to prepare for trial; that one of counsel had conferred with the county attorney, and a visiting attorney (interested but not employed), at which conference it was made known that one of counsel had been employed to represent Mary Robinson. This was in substance denied by counsel, who said that there was merely an agreement for waiver of examination.

Appellant in his affidavit for continuance asserted that he was not ready for trial because of the absence of two witnesses, Nick Best and Johnny Green; subpoenaes for them were sent to the sheriff of Fayette County and returned not executed. Best was in the Federal Penitentiary and Green was not found by the Fayette County officers. He thought if given time he could secure their attendance. The proof to be elicited from the two, as we analyze the affidavit, would not serve to throw light on the matter in issue. The most we can make of it is that perhaps Murrell thought when he shot Ketron he was shooting at Best.

Counsel also filed an affidavit giving the names of eight or nine witnesses, residents of Washington and Nelson Counties, who, as affiant was reliably informed, would say they had known appellant for a number of years, and that in their opinion he was insane; that due to business in court they lacked time to make investigation to ascertain the verity of their information, and that the question of appellant's sanity was developed during the last few days.

Appellant also moved the court to empanel a jury to inquire into the question of mental condition, and in support filed the affidavit of appellant's mother, in which were detailed facts, and the record of the court, referred to above. The motion was renewed on the 14th day of November. Again appellant asserted the absence of two alleged important witnesses, Robert and Della Wright, who had been subpoenaed "in sufficient time prior to the trial," but were ill. These witnesses, if present, would testify as to the bad mental condition of appellant.

The court overruled both motions and in written order pointed out that there had been an examination by a physician looking to the physical condition of appellant, which perhaps went further, the report showing that appellant was normal at that time. It was stated that it was agreed that the affidavits as to what Best and Green, and the Wrights, would testify might be read. As to other alleged absent witnesses, it was stated that when the case was called on the 11th, the court reassigned the trial for the 14th, and called for the services of partolmen, who were present, to assist in procurement of witnesses requested by appellant, and that all of the witnesses requested by appellant had been served, and were present ready to testify. It is agreed that the statements in the order were correct.

The questions presented arise from a procedural standpoint, on both grounds forcefully urged by counsel, are whether or not the court abused a discretion in overruling the motion for a hearing, touching upon the mental condition of appellant at that time, and in overruling motions for a continuance. Section 156 of the Criminal Code of Practice provides:

"If the court shall be of opinion that there are reasonable grounds to believe that the defendant is insane, all proceedings in the trial shall be postponed until a jury is impaneled to inquire whether the defendant is of unsound mind * * *."

If found so, the defendant is to be held in prison or asylum until restored, whereupon he shall be put upon trial. Two things are to be noted; one that the court is vested with a reasonable discretion, and second, the inquirendo here relates only to the mental condition at that time. In the case of Denny v. Com., 274 Ky. 419, 118 S. W. (2d) 778, 781, we had the question directly before us. We pointed out that Section 287 of the Criminal Code of Practice provides for a similar hearing following the entry of judgment.

In the Denny case the court did not pass on the motion for inquirendo, but passed it up to this court. The motion in this case came between verdict and judgment; the court's overruling was in effect to overrule without prejudice, since the court proceeded to render judgment. We held when the ruling was under Section 287 no appeal would lie. On the ruling in this case the question

is one of abuse or nonabuse of discretion, and as said in the Denny case:

"In any event, the law gives the trial judge discretion in the matter, and we have held that such a ruling when the motion is made during the course of the trial will not be reversed without an abuse of discretion. Turner v. Com., 191 Ky. 825, 231 S. W. 519; White v. Com., 197 Ky. 79, 245 S. W. 892; Davidson v. Com., 174 Ky. 789, 192 S. W. 846."

In the same case we pointed out that while the accused was in custody, the question of mental condition was still in control of the court, and in construing Section 296, Criminal Code of Practice, and Section 1137-8, Kentucky Statutes, we held that the warden of the penitentiary, after removal to that institution, may, if he acts upon reasonable grounds, institute inquiry as to the mental condition of accused. Stucker v. Com., 261 Ky. 618, 88 S. W. (2d) 280.

A resume of facts detailed in the Denny case will manifest that the proof of mental impairment was much stronger as tending to show that condition than was shown here, yet we held no abuse of discretion. In this case, while it does not appear that Dr. Pentz was appointed to make other than physical examination, he reported that appellant was mentally normal, which was sufficient to justify the court in proceeding with the trial, and in our holding that there was no abuse of discretion.

We observe from inspection of the court's order that it was agreed that the testimony of four absent witnesses might be read as their depositions. Section 189 of the Criminal Code of Practice. As to the group of witnesses who were absent and might have been procured, six or more in number, who would if present testify that appellant was mentally unsound, the most that can be said is that there was, perhaps, on the face of the court's order, no desire to present the proof, since these witnesses were not subpoenaed; had they been, and testified as outlined, their testimony would have been of cumulative nature.

We have also examined the instructions given by the court, and they appear to be in conformity to the law, covering every phase of the case, including correct instruction on the subject of voluntary manslaughter, self-defense and all reasonable doubt instructions. The court

gave in approved form and substance an instruction advising the jury that if they should find appellant to have been of unsound mind at the time of the homicide, they should acquit him, following a model laid down in Stanley's Instruction, p. 906.

We have examined what appears to be grounds for a new trial, based on newly discovered evidence presented after the term at which judgment was entered. This evidence, as we read the affidavits in support, would if introduced be cumulative on the question of mental condition prior to the homicide, some more or less remote. The established rule is that a new trial will not be granted where the evidence is merely cumulative. House v. Com., 284 Ky. 632, 145 S. W. (2d) 834, and cases noted in 6 Kentucky Digest, Criminal Law.

The Attorney General in brief asserts that the two attorneys, who were appointed to defend accused, were of experience and ability. Viewing the record and briefs, we agree and are prepared to say they performed their thankless task with credit to themselves. The court, as appears from the record, afforded appellant a fair trial, free from prejudicial error. This being our conclusion, we are compelled to affirm the judgment.

Whole Court sitting.