Elizabeth CERADSKY, Beverly Lea Ceradsky, Ollie Christina Ceradsky and Garland Dewayne Ceradsky, Claimants-Dependents, Appellants,

v.

MID–AMERICA DAIRYMEN, INC. d/b/a Bethany Cheese Company, Alleged Employer and Home Indemnity Company, Insurer, Respondents.

No. KCD 29901.

Missouri Court of Appeals,
Western District

.

April 30, 1979.

As Modified on Court's Own Motion for Denial of Rehearing and/or Transfer to Supreme Court June 11, 1979.

John H. Norton and Wm. Harrison Norton, Norton & Pollard, Inc., North Kansas City, for appellants.

Marvin L. Sharp, Stockard, Andereck, Hauck, Sharp & Evans, Trenton, for respondents.

Before SHANGLER, P. J., SWOFFORD, C. J., and WASSERSTROM, J.

SHANGLER, Presiding Judge.

The dependents of Ceradsky, a workman killed as he operated a truck owned by one Percell used to haul milk to Mid-America Dairymen for manufacture into cheese, appeal from a judgment to affirm denial of workmen's compensation by the Industrial Commission. The final award of the Commission rested on the determination that Percell, otherwise regularly employed by Mid-America Dairymen as a field man, operated the milk route as an independent contractor, and therefore Ceradsky was not an employee of Mid-America Dairymen within the Workmen's Compensation Law.

The claim was heard by the referee on deposition testimony. The facts from the evidence are not in dispute and frame but one issue: was the workman Ceradsky an employee of Mid-America Dairymen [then Bethany Cheese Company] at the time of his death within the coverage of the Workmen's Compensation Law? The referee determined that Ceradsky was in fact an employee and awarded benefits to the claimants-dependents. The Industrial Commission found anew from the same evidence that *Ceradsky was neither an employee in fact nor a statutory employee* of Mid-America Dairymen and entered a final award to deny compensation. In other—and more essential—terms, the decision of the Industrial Commission determined that Percell, in his role as milk drayer, was not an employee of Mid-America Dairymen and so did not impart such a status to Ceradsky on principles of agency. [See, *Gingell v. Walters Contracting Corporation*, 303 S.W.2d 683 (Mo.App.1957)].

The appeal from the judgment of the circuit court to affirm the final award of the administrative body poses to this court the question of law: whether the determination by the Industrial Commission that Ceradsky was not an employee of Mid-America Dairymen rests on sufficient competent evidence. *Maltz v. Jackoway-Katz Cap Co.*, 336 Mo. 1000, 82 S.W.2d 909, 918[7–9] (1935). And where, as in the case at bench, no dispute concerns the facts which bear on the status of employee, or not, the conclusions on the evidence adopted by the administrative body do not bind a court of review. *Corp v. Joplin Cement Company*, 337 S.W.2d 252, 258[7] (Mo. banc 1960).

The evidence shows conclusively that Percell was employed by Mid-America Dairymen [then the Bethany Cheese Company] as a field man and office help five days a week on a fixed schedule and for a fixed salary from which taxes and benefits money were withheld. In that role he was an *employee* of the Cheese Company [and later of Dairymen] within the intendment of § 287.020, RSMo 1969, and of the coverage of the Workmen's Compensation Law. The fieldman entailed duty as a solicitor of farmer business and troubleshooter to them on quality control and other incidents of milk production. The field man also advised the farmers on equipment and sold them supplies, particularly filter disks to cleanse the production sold to the company. The employment as field man, however, was augmented by a separate oral undertaking between Percell and Bethany Cheese to pick up milk from farmers within numerous counties in northwest Missouri and southern Iowa for delivery to the factory for process into cheese. This dual capacity of service continued for about eleven years and even after Mid-America Dairymen bought out Bethany Cheese.

It is the relationship of Percell as milk drayman for Bethany Cheese and successor Mid-America Dairymen, and not his duty as field man, which determines the status of Ceradsky on the claim for compensation. If Percell in the capacity of milk hauler was an employee of the cheese company, on principles of agency Ceradsky was within the coverage of the Workmen's Compensation Law; but if Percell was an independent jobber, Ceradsky does not stand to claim the benefits of an employee.

To operate the milk route Percell purchased a truck and hired a succession of drivers. Percell paid for the insurance and all maintenance on the vehicle. Ceradsky was hired at a regular salary to service the territory, outlined by the company as Route N in the agreement with Percell. Percell paid the wages, withheld the taxes, furnished Ceradsky the W–2 forms and paid contributions for unemployment compensation. Ceradsky received no payments from the company.

The cheese company paid the farmers per hundredweight for the milk and paid Percell a commensurate fee. The company checks were delivered to the farmers by Ceradsky and the other drivers.

Ceradsky ran the route six days a week from about midnight to eight in the morning. It was his procedure to leave empty milk cans [furnished by the company] with the farmer, pick up the full cans, unload them at the milk plant, and then to return home with the Percell truck to run the route anew the next morning. On occasions when the farmers left with the milk cans an order for supplies [generally, filter disks], Ceradsky remitted the purchase requests to the company and delivered the goods on the next round. There was intimation that in case of farmer discontent on the route, plant manager Hunt [and major shareholder of Bethany Cheese] felt free to reprimand Ceradsky, but the farmers dealt with Percell on milk matters and it is clear that Percell managed Ceradsky.

The truck owned by Percell and used by Ceradsky had an insulated bed for the transportation of the milk. That component bore the Bethany Cheese identification decal. The company had furnished Percell an insulated bed for the truck when the one in use was condemned by health inspectors. On the occasion when the Percell truck was disabled from damage, the company furnished a substitute, but Percell paid the cost of operation.

Ceradsky was killed one morning during the operation of the Percell milk truck along Route N. It is acknowledged that the death was out of and in the course of that duty. Only the question of status remains: whether Percell as milk hauler—and hence Ceradsky—was in the service of Dairymen within § 287.020.1 and so entitled to benefits of the Workmen's Compensation Law.

■ The final award of the Industrial Commission to deny compensation to the dependents rests on the determination that Percell was an independent contractor. That adjudgment rests on the rationale, simply, that as to Percell in the occupation of milk drayman, the cheese company exercised no control nor enjoyed right of control. The evidence allows acceptance without cavil only to the ultimate conclusion of direct control. That absent an observable right of control there can be no employment status for workmen's compensation, however, mistakes the law.

The definition of employment status, as the preeminent authority on Workmen's Compensation Law observes, almost of necessity takes the form of a distinction between an employee from an independent contractor.

> The reason is simple. If one wants to get something done without doing it oneself, there are really only two ways open: to hire an employee to do it, or to contract out the work to an independent entrepreneur. The employee-independent contractor distinction is not an artificial dichotomy invented by legal minds interested in fine distinctions for their own sake. It is a fundamental fact of business life which could not be abolished by the most grandiose legislation. Larson, *The Law*

*of Workmen's Compensation.* (1978) § 43.20.

Our courts, as virtually all others, have adapted the definition of *servant* worked out for vicarious tort liability purposes by Restatement of the Law of Agency Second [§ 220] to derive a definition of *employee* for workmen's compensation or other statutory purposes. *Cline v. Carthage Crushed Limestone Company,* 504 S.W.2d 102, 105[1, 2] (Mo.1973); *Lawrence v. William Gebhardt, Jr., & Son,* 311 S.W.2d 97, 102[1] (Mo.App.1958); *Pratt v. Reed & Brown Hauling Company,* 361 S.W.2d 57, 62 (Mo. App.1962):

> Section 220. Definition of Servant
>
> (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
>
> (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered;
>
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer;
>
> (i) whether or not the parties believe they are creating the relation of master and servant; and
>
> (j) whether the principal is or is not in business.

Where the evidence shows that a person to whom a service is rendered has a right to control the performance of the person who renders the service, the relationship of employer and employee is essentially established. *Tokash v. General Baking Company,* 349 Mo. 767, 163 S.W.2d 554, 555[3] (1942). That is the sense of subsection (1) of the Restatement § 220. Where the evidence lacks such a conclusiveness, however, whether the one who renders the service for the other acts as employee or independent contractor depends upon all the circumstances of the work relationship—so that control becomes only one indicium weighted with the several others to determine the true status. That is the sense of subsection (2) of the Restatement § 220. Larson, op. cit., *supra,* § 43.10; *Lawrence v. William Gebhardt, Jr., & Son, supra,* l. c. 102[1].

The term *servant* in Restatement § 220, however, formulates a common law purpose not altogether compatible with the *employee* status under our Workmen's Compensation Law. *Kourik v. English,* 340 Mo. 367, 100 S.W.2d 901, 905[3–7] (1937). The *servant* concept at common law delimits the vicarious tort liability of the master for harm done to the extent to which the employer has the right to control the servant activity. The compensation law, rather, concerns not injury by the employee to another but to himself—and not only from controlled activity but also from the activity of others beyond the control of the employer. Larson, op. cit., *supra,* § 43.42; Restatement of Agency Second, § 220, Comment on Subsection (1)g: Statutory interpretation. The scheme of workmen's compensation, however, discards the common law system of fault as an inadequate redress for worker disability and accepts such injury as inherent to the industrial process and—as a matter of urgent public welfare—allocates the risk to the industry

which gives it occasion. *Maltz v. Jackoway-Katz Cap Company, supra*, 82 S.W.2d l. c. 912[2–6]. In such a scheme, the right to control the detail of the work activity has no such immediate relevancy as in a case of vicarious tort liability. It is within the compelling purpose of the Workmen's Compensation Law—which has shed the defenses and disabilities of the common law to ameliorate the economic consequences of injury to the worker—that the employee status of the decedent Ceradsky must be determined. *Bethel v. Sunlight Janitor Service*, 551 S.W.2d 616, 618[1] (Mo. banc 1977).

The Workmen's Compensation Law [§ 287.020] defines *employee*[1] to mean

> every person in the service of any employer . . . under any contract of hire, express or implied, oral or written, or under any appointment or election.
> . . .

The employer-employee relationship by the statutory definition rests on *service*, construed by judicial definition to mean *controllable service*.[2] *Rutherford v. Tobin Quarries, supra* [n.1], 82 S.W.2d l. c. 923; *Maltz v. Jackoway-Katz Cap Company, supra*, 82 S.W.2d l. c. 912[2–6]. Where actual control or right of control of the work performance [and hence the presumptive employer-employee relationship] is not readily demonstrable from the evidence, our decisions have applied the secondary test for *servant* of subsection (2) of Restatement § 220 [whether the employment is a distinct occupation, the length of time of employment, whether the work is a part of the regular business of the employer, etc.] without doctrinaire rigidity and so as to give practical effect to the remedial purpose of the statute. As example, the factor (g) as to "the method of payment, whether by time or by the job," when by the hour gives "very strong evidence of the employment status" [*Pratt v. Reed & Brown Hauling Company, supra*, l. c. 64] yet when by the job [*Horn v. Asphalt Products Corporation*, 131 S.W.2d 871, 872[5] (Mo.App.1939)] or without payment altogether [*Lawson v. Lawson*, 415 S.W.2d 313, 319[6] (Mo.App. 1967)], is nevertheless consistent with the status of compensable employment according to the nature of the service. As further example, that a worker is engaged for no definite period of time [factor (f)] and is therefore subject to dismissal at will is "more conclusive" of control—and hence employment—than any other single circumstance [*Maltz v. Jackoway-Katz Cap Company, supra*, 82 S.W.2d l. c. 918] yet the unrestricted right of the employer to terminate the service "does not of itself make the relation one of agency" [*Rutherford v. Tobin Quarries, supra*, 82 S.W.2d l. c. 922[8, 9]], according to the amalgam of circumstances. Even as to control of the details of the work activity [factor (a)] frequently posed as the dominant proof of the employment relationship [*Fisher v. Hennessey*, 329 S.W.2d 225, 228 (Mo.App.1959); *Hackler v. Swisher Mower & Machine Company*, 284 S.W.2d 55, 58[2–4] (Mo.App.1955)], that proof is satisfied when a *right* to control is implicit in the circumstances of the relationship. [*Gingell v. Walters Contracting Corporation*, 303 S.W.2d 683, 686[2] (Mo. App.1957); *Maltz v. Jackoway-Katz Cap Company, supra*, 82 S.W.2d l. c. 918]. The factors of the subsection (2) Restatement § 220 test for *servant* which remain—wheth-

---

1. *Independent contractor* is not defined in the Workmen's Compensation Act. The term has been given the judicial definition: "An 'independent contractor' is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer, except as to the result of his work." *Vaseleou v. St. Louis Realty & Securities Company*, 344 Mo. 1121, 1122, 130 S.W.2d 538, 539[2–4] (1939). The decisions hold invariably that whether the work status is that of employee or independent contractor depends on the facts in the particular case. *Rutherford v. Tobin Quarries*, 336 Mo. 1171, 82 S.W.2d 918, 921[4] (1935).

2. The judicial introduction of the element of *control* into the employee status under the Workmen's Compensation law rests on the construction that "the framers of the act had in mind the law of master and servant and the relationship, duties, rights, and limitations arising out of the same." *Maltz, supra*, 82 S.W.2d l. c. 911[2–6].

er or not the worker employed is engaged in a distinct occupation [factor (b)], the kind of occupation [factor (c)], the skill required [factor (d)], whether the employer or the worker supplies the instrumentalities [factor (e)], and the others—bear on the ultimate issue of employment according to whether they show an integrated relationship of service between the worker and the activity served.

■ That is to say, on analysis, *the right to control the detail of the work* factor given predominance as proof of the employee status [3] shows through as merely an euphemism for worker activity of such a nature as to be a regular and continuous part of the manufacture of the product or other service. Thus, that the work activity is of a kind necessary in the operation of the business so that if not done by the claimant would be done by a direct employee of the business, essentially establishes the renderer of the service an *employee* within the purposes of the compensation law. *Maltz v. Jackoway-Katz Cap Company, supra,* l. c. 917[22]; *Lawson v. Lawson, supra,* l. c. 319; *Pratt v. Reed & Brown Hauling Company, supra,* l. c. 64; *Tokash v. General Baking*

*Company, supra,* 163 S.W.2d l. c. 556[7]; *Horn v. Asphalt Products Corporation, supra,* l. c. 872[5]; *Gingell v. Walters Contracting Corporation, supra,* l. c. 686[2]; *Vaseleou v. St. Louis Realty & Securities Company, supra,* 130 S.W.2d l. c. 540[5]. In such case, the purpose of the Workmen's Compensation Law does not expect a worker, otherwise without feasible means, to bear the burden of industrial injury but casts that risk upon the process of manufacture and, ultimately, on the cost of the product.[4] *Bethel v. Sunlight Janitor Service, supra,* l. c. 618[1].

The *ad hoc,* case by case, reasonings of our decisions as to whether the control test of the Restatement § 220 was met where the evidence was close to balance and the ultimate status of employee or independent contractor not clearly drawn, fall readily into the systematic treatment which Larson calls *the relative nature of the work test.* That analysis does not discard the traditional requirement of control: the presence of control conclusively proves the employment status. Where by the very nature of the work relationship or other circumstance, however, control is not conspicuous, the

---

**3.** The right of control which satisfies the conditions for employee status can be so attenuated as to be satisfied from an inference from the evidence of "apparent necessity" for the exercise at all. Thus in *Maltz v. Jackoway-Katz Cap Company, supra,* a hat salesman who worked on a commission basis in an assigned territory, used and paid for his own automobile expenses, who was given an order book and samples but was not required to report at any time nor was subject to the dictations of the employer as to the method of sale was an employee within the compensation law because he could be terminated at any time and so the *right of control,* albeit unexercised, remained in the employer. An almost equally attenuated right of control did not prevent the employee status, and compensation, in *Schultz v. Moerschel Products Co.,* 142 S.W.2d 106 (Mo.App. 1940). The sense of these cases, and our many others, is best stated in the dissent of Conford, J. [later adopted as the unanimous opinion of the Supreme Court of New Jersey in *Marcus v. Eastern Agricultural Ass'n,* 32 N.J. 460, 161 A.2d 247 (1960), reversing and adopting the dissenting opinion in 58 N.J.Super. 584, 157 A.2d 3, 10 (1959): "[T]he requirement of control is sufficiently met where its extent is commensurate with that degree of supervision which is necessary and appropriate, considering the type of work to be done and the capabilities of the particular person doing it."

**4.** The principle of risk distribution underlies, also, and for analogous reason, the workmen's compensation liability to a *statutory employee* under § 287.040 which deems as an employer

"[a]ny person who has work done under contract on or about his premises *which is an operation of the usual business which he there carries on.*" [Emphasis added.]

Liability for workmen's compensation results under the statute despite that the injured worker, by common law definition, may be an independent contractor and not an employee. *Schwandt v. Witte,* 346 S.W.2d 50, 52[3] (Mo. 1961). That is because the public policy of the statutory employee provision is to prevent an enterprise, through the guise of agreements with independent contractors of doubtful fiscal responsibility, to evade workmen's compensation [and even common law] liability for injury to a worker performed in the usual and ordinary business enterprise work. *Ferguson Air-Hydraulics Company,* 492 S.W.2d 130, 136[6] (Mo.App.1973); *Pruitt v. Harker,* 328 Mo. 1200, 43 S.W.2d 769, 772 (1931).

right to direct the detail of the work becomes only one indicium of control among others and the inquiry turns to the economic and functional relationship between the nature of the work and the operation of the business served. The inquiry, moreover, tends away from technical common law definitions to the public purpose of the scheme for workmen's compensation.[5]

The treatment by Larson rests on the theory of workmen's compensation legislation that [§ 43.51]

the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product.[6] It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the presumptive area of intended protection.[7]

■ Where the element of control in the work relationship does not emerge clearly, the relative nature of the work test determines employee status [for purposes of workmen's compensation] by [§ 43.52]

the character of the claimant's work or business—how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry

its own accident burden and so on—and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job.[8]

■ On the principles of subsection (2) of the Restatement § 220 and of the relative nature of the work test alike, the determination by the Industrial Commission that Percell as milk hauler was an independent contractor, first of Bethany Cheese and then of Dairymen, is without substantial support in the evidence. Rather, the undisputed proof constitutes Percell an employee and, hence, the Ceradsky dependents entitled to the benefits they claim.

The decision by the Industrial Commission rests, to all effect, on the traditional factors test of subsection (2) of the Restatement § 200 employed by our decisions. *Skidmore v. Haggard,* 341 Mo. 837, 110 S.W.2d 726, 729[3–5] (1937); *Cline v. Carthage Crushed Limestone Company, supra,* l. c. 105[1, 2]. The factual premise for the ultimate conclusion of independent contractor in the final award to deny compensation is the absence of proof that the cheese

5. A progression of jurisdictions have adopted *the relative nature of the work test* either by announced theory or by effect. See, e. g., *Marcus v. Eastern Agricultural Association, Inc., supra,* (N.J.1960); *Biktjorn v. Worley Homes, Inc.,* 12 A.D.2d 540, 206 N.Y.S.2d 744 (1960); *Seals v. Zollo,* 205 Tenn. 463, 327 S.W.2d 41 (1959); *Samson v. Borden Co.,* 92 So.2d 152 (La.App.1957); *Woody v. Waibel,* 276 Or. 189, 554 P.2d 492 (1976). See also, the cases cited in Larson, op. cit., *supra,* §§ 43.53–43.54 and the discussion citations by Dean Stern in Comment, 10 U.C.L.A.L.Rev. 161, 173 et seq. (1962). Our decisions, *Maltz v. Jackoway-Katz Cap Company, Pratt v. Reed & Brown Hauling Company, Horn v. Asphalt Products Company,* and the others cited, *supra,* as we have noted, give effect to the relative nature of the work principle without attribution by terminology or theory to accord employee status within a theory of industrial risk distribution where the right of control is attenuated, and, sometimes, only supposed.

6. That statutory purpose is declared as a matter of public welfare by *Hickey v. Board of Education of the City of St. Louis,* 363 Mo. 1039, 256 S.W.2d 775, 777[2–5] (1953); *Bethel v. Sunlight Janitor Service, supra,* and numerous other Missouri decisions.

7. Such, we have noted, is the theory of decision of *Pratt v. Reed & Brown Hauling Company, Horn v. Asphalt Products Company* and the several others cited on that discussion.

8. Once again, considerations of a continuous work service of a function normally discharged by employees of the business, the skill necessary to the work performance and, implicitly, the economic feasibility to require the worker to assume the burden of the injury loss all, to some measure, bear on the decisions which find the employee status, and hence coverage, in *Maltz, Horn, Pratt, Gingell,* and those other decisions we have mentioned recurrently, *supra.*

company had the right to control the detail of the work:

> The Commission finds that as to the milk route Bethany Cheese Company did not exercise control over Percell except as to a final result. *Percell owned his own equipment,* hired his own employees, paid the expenses, and handled the required social security and related matters for his employees. As to the milk route, *Percell was not paid a salary, but was paid according to the amount of milk delivered. There is no evidence that Bethany Cheese Company ever directed the specific means and method in operating the milk route.* Particularly convincing on the determination that Percell was an independent contractor, is the fact in this case that he hired another to carry out the contract . . . This right of substitution obviously bears upon the ultimate question of control by Bethany Cheese Company of the means and method of the performance of the work. In that the actual performance was carried out by Ceradsky, hired, paid, and directed by Percell, *the cheese company had virtually no way to control the work except as to the final result.* [Emphasis added.]

The conclusion that the cheese company enjoyed no right to control the detail of the milk route work and, hence, that Percell as drayman was not an employee, derives from two of the ten elements of the traditional proof of subsection (2) of the Restatement § 220: that Percell owned the work equipment [factor (e)] and that Percell was paid by commission and not by salary for work he could substitute another to perform [factor (g)]. The determination by the Commission does not assess the evidence in terms of the eight other factors of proof, among them: whether the work service is a distinct occupation or business [factor (b)]; whether the work is usually done under the direction of the employer or by a specialist without supervision [factor (c)]; the skill required in the particular occupation [factor (d)]; the length of time for which the service is rendered [factor (e)] and whether or not the work is part of the regular business of the enterprise served [factor (h)], among them.

The legal effect the Industrial Commission accords to the evidence on the factors of employment status considered is of doubtful validity. As to factor (e), while proof that an employer furnishes valuable equipment for the performance of the work almost invariably implies the employment status, evidence [as in this case] that the worker supplies the basic instrument of service does not tend to prove a contrary. The rationale is simply that an employer who furnishes expensive equipment, as a matter of sound business practice, will protect that investment by direction as to the manner of use. Larson, op. cit., *supra,* § 44.34. The workman who furnishes equipment, unlike the employer, sells not only personal service but the use of the equipment as well, and so such a circumstance does not necessarily bear to prove the status of independent contractor. *Horn v. Asphalt Products Corporation, supra,* l. c. 872[1–5]. Moreover, where equipment is used by the worker in a continuous service integral to a business [a circumstance shown by undisputed evidence but given no mention by the Commission], the inference of employment by the enterprise arises. *Pratt v. Reed & Brown Hauling Company, supra,* l. c. 63[6]. The evidence shows other undisputed circumstances which tend factor (e) to the employment status: the cans used for delivery of the milk were owned by the cheese company; the insulated bed for the transport of commodity was at times furnished by the company; the truck bed bore the decal "Milk For Bethany Cheese Company," and a substitute truck was furnished by the company when the Percell vehicle was disabled through accident.

So also as to factor (g). In traditional terms, the right of substitution implies the independent contractor status. "Personal service is a marked characteristic of the relation of master and servant [but] the right of substitution . . . is indicative of an independent contractual relation." *Coul v. George B. Peck Dry Goods Co.,* 326 Mo. 870, 871, 32 S.W.2d 758, 759[2,

3] (banc 1930). The application of this legal standard by the Industrial Commission to the evidence, however, is not sound. The cheese company was aware that Percell was already fully employed as its field man and so could expect only that any other service engaged from him would be performed by a supernumerary. In such circumstance, the substituted performance does not bear critically to define the work relation. As to the express finding that payment by commission rather than by wages tends to prove Percell was not an employee—such an inference does not follow. There can be no doubt that by any test of economic reality the payment by wages rather than by the job gives strong evidence of the employment status [*Pratt v. Reed & Brown Hauling Company, supra*, l. c. 64], but payment by commission may be consistent with either [Larson, op. cit., *supra*, § 44.33]:

> Payment on a time basis is a strong indication of the status of employment. Payment on a completed project basis is indicative of independent contractor status. Payment on a piece-work commission basis is consistent with either status.

Where the other factors of the work relationship show—as does the undisputed evidence—that the commission is paid for ongoing service of the same labor for an indefinite duration, payment by commission becomes, in functional terms, equivalent to wages. *Maltz v. Jackoway-Katz Cap Company, supra*, 82 S.W.2d l. c. 916[16, 17].

Were we to assume nevertheless that the status of independent contractor was aptly drawn from the evidence on the two elements of that proof, the neglect of the Industrial Commission to consider the uncontradicted evidence that the milk drayage work was not a distinct occupation but merely an aid to a function performed by the cheese company [factor (b)], that the milk drayage occupation required no particular skill [factor (d)], that the service by Percell in that capacity was continuous and of long duration [factor (f)], among other factors, which tend to prove the employee status and which otherwise establish that relationship as a matter of law by the subsection (2) of the Restatement § 200 test—

suffices to hold that the denial of compensation was not on substantial and competent evidence on the whole record.

The right to control the details of the work test of subsection (2) of the Restatement § 220, by the very nature, tends to be inconclusive. That is simply because, as our decisions show, the right to control is not often a demonstrable fact of the work relation. The relative nature of the work test shows a more certain way. It appraised the employment status in terms of the work function: whether the labor forms a regular and continuous part of the manufacture and whether, in relation to this process, the worker conducts an independent business feasible to channel the cost of industrial injury or, rather is economically dependent for that purpose upon the business served. Larson, op. cit., *supra*, § 43.51; *Marcus v. Eastern Agricultural Association, Inc., supra*, 157 A.2d l. c. 13; *Woody v. Waibel, supra*, 554 P.2d l. c. 495. In other words, the relative nature of the work test gives effect to the remedial public policy of our Workmen's Compensation Law to place on industry, on the principle of allocation of risk, the loss suffered by a worker and dependents from injury or death. *Hickey v. Board of Education of City of St. Louis, supra*, 256 S.W.2d l. c. 777[2–5]. This test also, on the undisputed evidence before the Industrial Commission, determines as a matter of law that Percell was an employee of the cheese company in the status of milk hauler.

> Was the milk drayage service by Percell a regular and continuous part of the manufacture by Bethany Cheese Company and successor Mid-America Dairymen, Inc.?

The business of Bethany Cheese Company and successor Mid-America Dairymen, Inc. was to process milk into cheese. To that purpose, a continuous supply of milk was essential. This supply was from farmers over an extensive territory designated by the company as Route N. It was this area which Percell served for more than eleven years, first for Bethany Cheese and then for Dairymen, in his role as milk drayman. It was the role of Percell as field man [accord-

ing to Hunt, plant manager and principal shareholder of the company] to solicit farmers to ensure the supply of milk and then to advise them on quality control to maintain the product fit for manufacture into cheese. Thus, the farmers, in any realistic sense, were patrons of the company. It was the role of Percell, also, to accept orders for equipment, particularly for filters, needed in the production of the milk. The milk hauler, Ceradsky, frequently took the sales orders incidentally to the milk pick-ups and delivered checks to the farmers from the company for their produce, and so performed a usual duty of field man Percell, in that role an admitted employee of the company. The milk was picked up regularly every day; by Ceradsky on the week days and by Percell on Saturdays and Sundays. The company could not function without the assured supply of milk and on the occasion[s] when the Percell truck broke down, a company truck was made available "in order to get the milk in." The transport of milk was by bulk as well as by can. The bulk hauls were by the Bethany Milk Transportation Company [owned by plant mana-

ger Hunt and his son] and the hauls by can were by Percell. These transport services, however, were only supplemental to the milk drayage services the company performed by trucks owned and operated for that purpose. At the time of the Ceradsky casualty, Bethany Cheese Company owned four or five trucks for the milk haul operation.[9]

This evidence allows no sensible doubt that the work by Percell as milk hauler for the company over eleven years was a continuous service or that he performed a labor regularly done by the employees of the cheese company.[10] In actual effect, had not Percell or other "independent" agency hauled the milk, the cheese manufacture could not fully function. The real work relationship between Percell and the company cannot be defined without consideration of this evidence neglected by the Commission nor can the right to control the detail of the work test by which decision was reached be applied aptly. The limitation of that standard as a determinant of the work status, when separated from the circumstances of actual economic function,

9. The evidence shows without dispute that at the time of the Ceradsky mishap Bethany Cheese was in conversion from can transport to bulk transport of milk with a concomitant change of equipment from bed trucks to tank trucks. At the same time, Bethany Cheese dispensed with the services of independent haulers and a number of its own haul trucks and—we assume properly—for the same reason: the conventional bed trucks were no longer suitable to the new method of bulk milk collection. At the time of the Ceradsky event [according to plant manager Hunt] Bethany Cheese still owned four or five trucks, presumably of the bed order, and [according to Percell] the independent haulers were all but discontinued: "There was only one to two left, maybe not any by then." The evidence is incomplete, however, as to how Bethany Cheese supplanted the discontinued owned and contracted bed trucks as the operation converted to bulk haul. The evidence is clear that Bethany Milk Transportation Company, a tank bulk-hauler, remained an independent contract hauler. Bethany Milk Transportation Company was owned jointly by the Hunts, father and son. The senior Hunt was also the owner of Bethany Cheese as well as the plant manager. The junior Hunt was not only the owner of Bethany Milk Transportation with his father, but was also a plant manager of Bethany Cheese with

his father. To the extent such a relationship, in economic reality, is described by the term, Bethany Milk Transportation was an "independent contractor" of Bethany Cheese. It is undisputed, however, that whatever the numerical alignment of owned haul equipment and contracted haul equipment at the time of the Ceradsky death, during the time of his service Bethany Cheese owned and operated transport vehicles to do the same work done by Ceradsky.

10. The administrative decision that Percell as milk hauler was an independent contractor, not an employee, cites *Carman v. Central Western Dairies,* 58 S.W.2d 781 (Mo.App.1933) for support. That case determined that a route driver who transported milk from a dairy to a dry milk plant was not an employee of the plant. The product transported, however, is the only coincidence between the cases. The arrangement in *Carman,* unlike the continuous and regular service by Percell, was by the trip separately as to price and work, on a route chosen by the driver on each occasion, and at those irregular times when such a service was needed. The driver in no sense discharged the same labor as a usual employee of the company as did Percell.

becomes apparent by the rationale given by the Industrial Commission for denial of compensation:

> The Commission finds that as to the milk route Bethany Cheese Company did not exercise control over Percell except as to a final result . . . . There is no evidence that Bethany Cheese Company ever directed the specific means and method in operating the milk route.

To the extent that there was no declared understanding or overt exercise of control between Percell and the company, the decision has literal validity. In terms of the work function, however, the right to control [the dominant factor, in traditional terms of the employment status (*Tokash, Maltz, etc., supra*)] need only be commensurate with the supervision appropriate to the kind of work to be done and the skill required to do it. *Marcus v. Eastern Agricultural Association, Inc., supra*, 157 A.2d l. c. 13.

Thus, while the company may not have undertaken to detail the activity on the milk route or impose work hours, the route was defined by the company, and the daily two-hundred mile round by Ceradsky from midnight to eight in the morning, conformed with the necessities of the farmer-patrons and of the work schedule at the plant. It was also of concern to the company that the farmer-patrons be satisfied with the milk pick-up service as well as with prompt payment for their produce and with the completion of their sales orders—all functions directly related to the company business function and discharged by Ceradsky. It may be that the farmers complained to Percell and not to the company for shoddy service on the route, but plant manager Hunt testified that he would reprimand a driver for such neglect. As a practical matter, since the arrangement between the company and Percell for the milk haulage was at will, terminable without legal consequence, the company would certainly discharge Percell should his performance injure the business.

Moreover, the milk haul routine was actually, and not only functionally, a regular activity of the company business. The company plant was the terminus for the milk haul route. It was there Ceradsky physically delivered the milk, took on empty company cans for the next round, remitted orders for equipment, filled prior orders, and picked up checks for delivery to the farmer-patrons.

In terms of the relative nature of the work test, the evidence decisively shows that the milk haul work of Percell was an indispensible integer in the process of cheese production by the company. In terms of the right to control, the evidence clearly shows that the company reserved all necessary to ensure that the milk haulage as a mechanism of production remained effective [*Harper v. Home Imp. Co.*, 235 S.W.2d 558, 559[3] (Mo.1951); *Maltz v. Jackoway-Katz Cap Company, supra*, 82 S.W.2d l. c. 918] and—coincidentally—proved those composite elements of subsection (2) of the Restatement § 220 definition of the employment status.

> Was the milk drayage service by Percell an independent business feasible to channel the cost of industrial injury to its workers?

The evidence shows beyond question that Percell as milk hauler [and, thus, Ceradsky] was in no real sense a viable economic unit apart from the cheese company. Rather, the Percell milk haul activity was merely a totally dependent appendage of the cheese production process for which alone Percell used his equipment and performed his haul services. The economic reality is that the Percell drayage operation lacked resources to allocate the cost of injury to the two workers of that enterprise—Percell and Ceradsky. The cheese company, at the time of the casualty to Ceradsky, was in the process of divestment of the "independent" milk haul arrangements. It is fair to assume that these arrangements became necessary when the company business exceeded the capacity of its own equipment. That is only to say again that Percell as milk hauler performed a usual and regular labor of a regular company employee. To deny benefits to Ceradsky in these circumstances would be to contradict the purpose of the

Workmen's Compensation Law that the enactment be liberally construed [§ 287.800] so as to extend its benefits to the largest possible class. *Dost v. Pevely Dairy Company*, 273 S.W.2d 242, 244[2] (Mo.1954). To allow compensation to a plant employee [among the fifty] engaged in the same occupation but not to Ceradsky, would be to violate the public policy which prevents evasion of liability by an employer behind a facade of "independent contract" for injury to a worker in the usual course of the enterprise business. *Gingell v. Walters Contracting Corporation, supra,* l. c. 686[2]. As a matter of fair statutory duty, the risk of injury or death to Ceradsky rightfully falls on the cheese company, an enterprise fully able to distribute the cost of such a loss.

The judgment is reversed and remanded with directions that the circuit court further remand the proceedings to the Industrial Commission with directions that an award for compensation be entered for the Ceradsky dependents.

All concur.