**Randall GLENN, Respondent,**

v.

**STONELOAD DELIVERY COMPANY, Appellant,**

**State of Missouri Second Injury Fund, Respondent.**

**No. WD 49704.**

Missouri Court of Appeals, Western District.

March 21, 1995.

Bruce C. Jackson, Jason M. Pottinger, Kansas City, for Randall Glenn.

Scott Mach, The Popham Law Firm, Kansas City, for Stoneload Delivery Co.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Sue A. Sperry, Asst. Atty. Gen., Kansas City, for Second Injury Fund.

Before BRECKENRIDGE, P.J., and ELLIS and LAURA DENVIR STITH, JJ.

ELLIS, Judge.

This case arises from a workers' compensation claim filed by Randall Glenn against Stoneload Delivery Company, Inc. ("Stoneload"), and Concrete Haulers, Inc., and their insurance carriers.

Stoneload is in the business of delivering materials such as stone, fly ash and oil from one location to another. It leases the trucks used to haul the materials from various individuals. Glenn and his wife co-owned a dump truck which they leased to Stoneload beginning January 2, 1992 for a twelve

month period. Until he was injured, Glenn reported on a daily basis to Limpus Quarry[1] where his truck was loaded. He then delivered the load to a customer designated by Stoneload. During this period, Glenn received a weekly paycheck from Stoneload, with 10% of the gross revenue deducted by Stoneload and allocated as follows: 4% to Workers' Compensation premiums, 2% to general liability, and 4% allocated to cover administrative costs. Thus, Glenn was paid 90% of the gross revenue of his truck.

On July 1, 1992, Stoneload began "leasing" its drivers from Concrete Haulers, which is in the business of selling pre-mixed concrete and "leasing" employees to other companies. As of that date, Glenn's weekly paychecks came from Concrete Haulers rather than from Stoneload. The same deductions were taken from his paychecks after Concrete Haulers began issuing the paychecks. In fact, other than the paycheck coming from Concrete Haulers rather than Stoneload, there was no change in the nature or character of Glenn's employment or his payment after July 1, 1992.[2]

On August 3, 1992, while making a routine maintenance check on his truck in the course of a regular work day, Glenn noticed a brake drum on his truck was cracked, creating a dangerous condition within the truck. He notified the quarry dispatcher of the problem and left work early to pick up a replacement part to repair the truck. After picking up the part, he drove to his home where he began the work to repair the brake drum. While repairing the truck, he fell on the concrete below, injuring his hip and back. Despite his pain, he finished repairing the truck that evening. He reported for work the following day, but as the day progressed, the pain in his back increased. The next day, August 5, 1992, he saw his personal

physician, Dr. William T. Betz, D.O. Dr. Betz prescribed conservative treatment for Glenn's back pain. However, this treatment was unsuccessful and Glenn eventually underwent a surgical fusion performed by Dr. Daniel Downs, an orthopaedic physician, on December 4, 1992. Metal reinforcements were placed in his lower back and a battery pack was installed to help the bone graft heal. At the time of the hearing, Glenn was still being treated by Dr. Downs.

On January 5, 1993, Glenn filed a claim with the Missouri Department of Labor and Industrial Relations Division of Workers' Compensation. Following a hearing, the Administrative Law Judge issued an award denying Glenn's claim for workers' compensation benefits and finding that Glenn was not an employee of either Stoneload or Concrete Haulers. Glenn timely filed an application for review with the Labor and Industrial Relations Commission. On June 16, 1994, the Commission issued an award reversing the order of the ALJ. The Commission found that Glenn was an employee of Stoneload, that the injury arose out of and in the course of employment, that a medical causal relationship existed between the fall and the injury, and that Glenn was entitled to temporary total disability payments under the Missouri workers' compensation law from Stoneload and its insurance carrier. Stoneload appeals the Commission's award.

Stoneload raises two points on appeal. First, it contends the Commission erred in finding Glenn was Stoneload's employee at the time of the alleged accident because the evidence showed Glenn was, at best, an independent contractor. Second, Stoneload contends the Commission erred in finding Glenn's injuries arose out of and in the course of his employment with Stoneload.

1. Limpus Quarries is a separate company owned and operated by the same two individuals who own Stoneload. Both companies are run out of the same office and by the same office manager.

2. The record does not contain any written agreement between Stoneload and Concrete Haulers regarding the "leasing" of employees. Although the paychecks began coming from Concrete Haulers in July, 1992, according to Nancy Morelock (office manager for Limpus Quarries and

Stoneload and manager of Concrete Hauler's bookkeeper), there was no written agreement between Stoneload and Concrete Haulers on this issue until January 1, 1993. In any event, Glenn was not a party to this employee leasing agreement: he was a party only to the truck lease with Stoneload. Glenn was not notified of this change nor did he question Stoneload regarding it.

This court reviews a workers' compensation case in the light most favorable to the award of the Commission and upholds the Commission's decision if it is supported by competent and substantial evidence. *Page v. Green*, 686 S.W.2d 528, 530 (Mo.App. 1985). We will only set aside the award if the Commission's findings are clearly contrary to the overwhelming weight of the evidence. *Carroll v. Loy–Lange Box Co.*, 829 S.W.2d 86, 88 (Mo.App.1992).

In its first point, Stoneload contends the Commission erred as a matter of law in finding Glenn was an employee of Stoneload at the time of the alleged accident because the evidence did not establish either an actual or statutory employment relationship. Stoneload contends Glenn was, at best, an independent contractor.

"Determining the employment status—employee or independent contractor—of a person injured during the scope and course of employment involves a question of law this court may correct." *Gaston v. J.H. Ware Trucking Inc.*, 849 S.W.2d 70, 73 (Mo.App. 1993). The issue of whether a claimant is an employee or independent contractor depends on the facts of each case. *Id.*

In *Gaston*, this court applied *Ceradsky v. Mid–Am. Dairymen, Inc.*, 583 S.W.2d 193, 197 (Mo.App.1979), and *Miller v. Hirschbach Motor Lines, Inc.*, 714 S.W.2d 652 (Mo.App.1986), to a case factually similar to the one at bar. As we stated in *Gaston*, generally, in an employer-employee relationship, the employer either reserves the right to control or actually controls the means and details associated with completing the job. *Id.* at 73. An independent contractor, on the other hand, is one who, exercising independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer, except as to the result of his work. *Id.* at 74. When the evidence does not clearly demonstrate the employer's actual or right to control, the "relative nature of the work test" determines employment status for purposes of worker's compensation. *Id.* Under this test, the right to direct the detail of the work becomes only one indicium of control and the inquiry turns to the economic and functional relationship between the nature of the work and the operation of the business served. *Id.* Rather than looking at technical common law definitions, the inquiry tends toward the public purpose of the scheme for workmen's compensation which, of course, is to make industry bear the burden of compensating employees for injuries arising out of employment. *Id.*

> The factors to consider under the nature of the work test include: the character of the claimant's work or business—how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer's business, that is, how much it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job.

*Id.*

In *Gaston*, the claimant, a truck driver, was injured as he changed a battery in the truck which he owned but drove exclusively for the defendant-employer. The parties had a written agreement which specifically described the claimant as an independent contractor. Pursuant to the agreement between the parties, the claimant was responsible for all maintenance on the truck, which had the employer's name painted on the side of it. The employer's dispatchers told the claimant when and where to pick up loads but the claimant could decline to haul loads at his own discretion. The claimant was paid on a commission basis and he paid for all his expenses incurred during trips for the company. The employer did not deduct taxes from the claimant's paycheck, nor did it pay for health insurance.

*Gaston* repeated the principle that the workers' compensation law is to be broadly and liberally interpreted so as to extend its benefits to the largest possible class and any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee. We then applied the nature of the work test and held that, despite the contractual designation of independent

contractor, Gaston was an employee of the defendant-employer for workers' compensation purposes as a matter of law on the undisputed evidence. *Gaston* at 74.

Here, the only written agreement between the parties, the truck lease, does not desig-nate Glenn as an independent contractor. As in *Gaston*, although Glenn was responsible for maintenance on the truck, he drove his truck exclusively for Stoneload[3]. Glenn's truck bore Stoneload's placard. Glenn could decline to accept a load, but once a load was accepted, Stoneload controlled the pick-up by use of the quarry dispatcher. Glenn hauled under the authority of Stoneload using Stoneload's various vehicle identifying numbers and Stoneload's nameplate. He was paid at regular weekly intervals rather than upon completion of a delivery. He was required by contract to carry his own accident and liability insurance with a policy and carrier approved by Stoneload but could not pass this cost on to customers because he only hauled for Stoneload.

■ In arguing Glenn was not an employee, Stoneload emphasizes that Glenn was responsible for maintenance on the truck; that Stoneload did not care who drove Glenn's truck so long as the driver met DOT regulations; that Glenn bought his own gas and Stoneload did not direct where Glenn bought gas; that Glenn was not required to work regular hours and could take days off whenever he wanted; and that Glenn could not work on the truck at the quarry or leave it there overnight. Stoneload tries to distinguish *Gaston* on the basis that the lease in *Gaston* required the employer's permission to drive for other companies whereas Glenn could choose to work elsewhere.[4]

Stoneload's argument is not persuasive. In finding employee status in *Gaston*, we emphasized the continuous nature of the work Gaston performed and the fact that he did not make independent contracts with other companies or with the employer for each load he carried. *Id.* at 74. Likewise, Glenn

provided Stoneload with continuous service from the date he signed his contract until the date of his injury. A separate contract was not required for each load. Although he was paid by the number of loads he hauled, he was paid at regular weekly intervals rather than upon completion of a delivery. And, as in *Gaston*, Glenn performed the type of work activity that was necessary for Stoneload's business.

Furthermore, and of particular significance, Stoneload deducted 4% of Glenn's income for workers' compensation insurance. In *Gaston*, we found employee status even though the employer in that case did not make such a deduction.

On this point, Stoneload contends the workers' compensation premiums applied only to instances where the driver was injured while delivering a load and would not apply when a driver was injured while repairing his truck. It is attempting to separate the truck lease from the driving. Although Glenn testified that 30% of his paycheck could be apportioned to him as the driver of the truck, neither Glenn's paystubs nor the truck lease reflect that his pay was apportioned separately to the truck lease and the driving. In fact, the truck lease is silent altogether as to compensation. Furthermore, when Concrete Haulers began issuing the checks in July, 1992, it paid the full amount of compensation due Glenn, including whatever portion was supposed to be allocated to the truck lease to which Concrete Haulers was never a party.

In *Gaston*, where the claimant owned his own truck and was injured while repairing it, we repeated the principle that:

> a workman who furnishes himself and the necessary equipment sells not only personal service but the use of the equipment as well and when ... the equipment is used by the worker in a continuous service integral to the business, a factual inference of employment arises.

Thus, Stoneload's contention that Glenn's employment as driver of the truck was sepa-

---

3. Glenn did use the truck on two occasions to haul rock for himself and a friend.

4. Stoneload also tries to distinguish *Gaston* on the basis that in *Gaston*, the claimant was in the

middle of a delivery when he was injured. However, this does not relate to his employment status: it relates to whether the injury arose out of the employment, which is discussed, *infra*.

rate from the truck lease (and thus its repairs), is erroneous, even if it were supported by the record.

■ The Commission's conclusion that Glenn was an employee is supported by the evidence, and we hold, as a matter of law, Glenn was an employee of Stoneload [5] at the time of his injury.

In its second point, Stoneload contends the Commission erred in finding as a matter of law that Glenn's injuries arose out of and in the course of his employment with Stoneload because (1) Glenn failed to prove he was an employee of Stoneload; (2) he failed to prove he was injured as a rational consequence of any of Stoneload's job duties; and (3) he failed to establish the injury arose out of and in the course of employment under the dual purpose or mutual benefit doctrines.

First, we have already established the Commission did not err in finding Glenn was an employee of Stoneload. As to Stoneload's second and third sub-points, *Gaston* is again dispositive. In finding Gaston was within the course and scope of his employment when he was injured, we stated:

> "In the course of" generally means within a period of employment and at a place the employee may reasonably be while engaged in the furtherance of the employer's business or some activity incident thereto. Under the mutual benefit doctrine, the employee is within the scope and course of his employment if the employee suffers an injury while performing an act for the mutual benefit of the employer and the employee.

*Gaston* at 76 (citations and internal quotation omitted). We held that because the contract between Gaston and the employer made Gaston responsible for his own repairs, changing the battery in his own driveway was a reasonable place to do so. *Id.* Gaston benefitted from having the truck repaired cheaply while the employer benefitted from the truck being in good repair so Gaston could timely complete the trip. *Id.* Thus, we held, the mutual benefit doctrine applied, and Gaston could recover for his injuries.

As Stoneload points out, *Gaston* differed factually in that Gaston picked up his load in California and his batteries failed en route to St. Louis (somewhere in California or Arizona). Rather than having the truck repaired right away, he left his truck running over night, and then repaired his truck in his driveway in Independence, Missouri. However, his intention in going to his home in Independence was not just to do the repairs there, but to purchase the batteries, install them, take a shower, and then continue his trip. Stoneload contends that even if Glenn was its employee, he was not in the course of his employment when he was injured because he was repairing the truck on his own time at his home and was not in the process of making a delivery when he was injured. We find this argument without merit and that the mutual benefit doctrine is applicable.

■ Although Glenn was not in the process of making a delivery when he was injured, his repair of the truck was a continuation of his work day. He discovered the problem during a routine maintenance check during the regular work day, notified the dispatcher of the situation and that he would need to leave early, and then proceeded to get the part, and go to his home, where he began the repairs. It is no different than Gaston detouring to his home in Independence to make his repairs. And, just as in *Gaston*, Glenn's repairing the truck benefitted Stoneload in the same way Gaston's employer was benefitted: it ensured Stoneload that Glenn's truck was in good repair so Glenn could make Stoneload's deliveries in a safe and timely fashion. This is evidenced by the fact that he was on the job the next morning. Stoneload's second point is denied.

The decision of the Commission awarding workers' compensation benefits to Glenn is affirmed.

All concur.

---

5.  Concrete Haulers is not a party to this appeal. The Commission explained why it found Glenn was an employee of Stoneload rather than Concrete Haulers. However, Stoneload does not raise this in its brief.