JANET HANSON *v.* TRANSPORTATION
GENERAL, INC., ET AL.
(SC 15766)

Borden, Berdon, Norcott, Katz and Peters, Js.

Argued February 20—officially released July 28, 1998

*Lawrence C. Scrignari,* for the appellant (plaintiff).

*Jason M. Dodge,* for the appellees (defendants).

*Jean E. Tomasco, Richard F. Vitarelli, Craig A. Berrington, Bruce C. Wood* and *Steven A. Bennett* filed a brief for the American Insurance Association as amicus curiae.

*Jeffrey R. Babbin, Joan Allen Rowe* and *John G. Zandy* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Opinion*

PETERS, J. The Workers' Compensation Act (act), General Statutes § 31-275 et seq., provides benefits only for those workers who have the status of "employees" at the time of their injury. The principal issue in this certified appeal is whether an owner-operator of a taxicab qualifies as an employee of the taxicab company with which he contracted to provide taxicab service.

The plaintiff, Janet Hanson, the surviving spouse of Allen Hanson (decedent), filed a workers' compensation claim to recover survivor benefits for the death of the decedent while he was driving a taxicab in accordance with his written agreement with the defendants, Transportation General, Inc. doing business as Metro

Taxi Service (Metro), and Hartford Insurance Company.[1] The compensation commissioner for the third district (commissioner) dismissed Hanson's claim as a result of his finding that, on the date of the decedent's death, he had been an independent contractor and not an employee of Metro. Hanson appealed to the compensation review board (board), which affirmed the decision of the commissioner. That decision was then affirmed by the Appellate Court. *Hanson* v. *Transportation General, Inc.*, 45 Conn. App. 441, 447, 696 A.2d 1026 (1997).

We granted Hanson's petition for certification to consider the merits of her claim for compensation, either under a proposed "relative nature of the work" test or under the existing "right to control" test. *Hanson* v. *Transportation General, Inc.*, 243 Conn. 914, 914–15, 701 A.2d 329 (1997). We also agreed to determine Hanson's ancillary evidentiary claim.[2] We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court outlines the basic facts. "[Metro] . . . operated a fleet of taxicabs through the use of both owner-operator and lease agreements. Drivers could either lease or purchase cabs from [Metro]. The decedent, under an owner-operator

---

[1] Because the defendants apparently present the same arguments to this court, having filed a joint brief that makes no distinctions between them in this respect, we will refer to them as one party, Metro. They were so denominated in the proceedings before the commissioner and the board.

[2] Our grant of certification was limited to the following issues:

"Should the relative nature of the work test be adopted as an alternative to the right to control test in concluding whether the plaintiff's decedent, a cab driver, was an independent contractor and not an employee of the defendant taxi cab company?

"Did the Appellate Court properly affirm the finding of dismissal pursuant to the right to control test in light of the department of transportation regulations?

"Did the Appellate Court properly affirm the compensation review board's refusal to correct the finding of dismissal as requested by the plaintiff?" *Hanson* v. *Transportation General, Inc.*, supra, 243 Conn. 914–15.

agreement, drove a Metro [cab] from 1987 until he was murdered while operating a Metro [taxicab] on April 16, 1990. Under the terms of [Metro's] standard owner-operator agreement, [Metro] held legal title to the [taxicab] and the owner-operator maintained a beneficial ownership.[3] Upon the termination of the relationship, which could be done by either party after forty-eight hours notice, legal title [to the taxicab] would be transferred back to the owner-operator. In return for the weekly payment by the owner-operator of 'stand dues'[4] in the approximate amount of $425, plus an additional $100 per week if a second driver was used, [Metro], under a certificate issued to it by the department of transportation, allowed the owner-operator the right to operate a taxicab. [Metro] required the owner-operator to be properly licensed, to use a taxicab meter and radio approved by the department of transportation and to obey its regulations and to adhere to all federal, state and local laws. The owner-operators also were required to maintain insurance in the minimum amount required by law at their own expense and to pay for the use and operation of the [taxicab] including repairs, maintenance, fines, tickets, towing and all taxes or other assessments imposed by governmental agencies. Under the agreement, the owner-operator could set the hours of operation, hire a driver for the taxicab, use the vehicle for personal use and keep all fares derived from the operation of the [taxicab]. [Metro] did not pay the owner-operator, provide benefits, request income records or collect payroll or social security taxes." *Hanson* v. *Transportation General, Inc.*, supra, 45 Conn. App. 442–43.

---

[3] "[Metro] was required to hold legal title to the vehicle because, in accordance with Connecticut law, all taxicabs are required to be titled in the name of the certificate holder, in this case, [Metro]." *Hanson* v. *Transportation General, Inc.*, supra, 45 Conn. App. 442 n.2.

[4] " 'Stand dues' are a combination of leasing, taxes and insurance costs." *Hanson* v. *Transportation General, Inc.*, supra, 45 Conn. App. 442 n.3.

## I

The first issue presented by Hanson's appeal is whether, in deciding whether a worker is an employee under the act, we should adopt the "relative nature of the work" test as an alternative to the "right to control" test. The Appellate Court declined to address this issue on its merits because it felt bound by this court's decision in *Ross* v. *Post Publishing Co.*, 129 Conn. 564, 29 A.2d 768 (1943). In that case, we held that "[t]here is no dispute about the ultimate test. It is the right of general control of the means and methods used by the person whose status is involved." Id., 567. Although the issue of the propriety of recourse to the "relative nature of the work" test raises serious questions that warrant plenary exploration by this court; *Doe* v. *Stamford*, 241 Conn. 692, 696–97, 699 A.2d 52 (1997); we are not persuaded that we should engraft this test onto our long-standing workers' compensation law.

## A

The issue that Hanson has raised must be decided in the context of two jurisprudential principles that limit our authority to afford her the relief that she seeks. First, because this is a workers' compensation case, it is governed by the special rules of construction that we have long held applicable in such cases.[5] Second, because this is a case in which Hanson asks us to

[5] This appeal does not involve the rights of a third party tort victim to recover against Metro for the misconduct of one of its drivers on the basis of the principles of actual, implied, or apparent authority. See, e.g., *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 132–41, 464 A.2d 6 (1983) (discussing agency principles in contract case); *Fireman's Fund Indemnity Co.* v. *Longshore Beach & Country Club, Inc.*, 127 Conn. 493, 496–97, 18 A.2d 347 (1941) (applying similar agency principles in tort action). The issue, rather, is what the decedent driver knew or should have known of his own status under the act.

It is true that the right to control test, in its present form, was embedded into the act by early cases relying on similar rules in tort cases. Nonetheless, that construction of the act has been ratified by legislative acquiescence.

overrule a line of judicial precedents that the legislature has left intact for eighty years, it must be reconciled with the principles of stare decisis.

Connecticut first adopted a statutory scheme of workers' compensation in 1913. *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 381, 698 A.2d 859 (1997). Although some statutes have common-law roots that may enlighten their construction, the act is not such a statute. "[T]he workers' compensation system in Connecticut is derived exclusively from statute. . . . A commissioner may exercise jurisdiction to hear a claim only under the precise circumstances and in the manner particularly prescribed by the enabling legislation." (Citations omitted; internal quotation marks omitted.) *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 576, 698 A.2d 873 (1997); see also *Kinney* v. *State*, 213 Conn. 54, 60, 566 A.2d 670 (1989); *Gagnon* v. *United Aircraft Corp.*, 159 Conn. 302, 305, 268 A.2d 660 (1970). "Because of the statutory nature of our workers' compensation system, policy determinations as to what injuries are compensable and what jurisdictional limitations apply thereto are for the legislature, not the judiciary or the board, to make." *Discuillo* v. *Stone & Webster*, supra, 577. Whatever the policy implications of this case may be, "the issue presented is, at bottom, a matter of statutory construction." *Doe* v. *Stamford*, supra, 241 Conn. 697.

As a matter of statutory construction, to overrule our long-standing invocation of the "right to control" test, we would have to reconcile such a ruling with the presumption of legislative acquiescence in judicial interpretations that the legislature has not overturned. We have long acted on the hypothesis that the legislature is aware of the interpretation that the courts have placed upon one of its legislative enactments. Once an appropriate interval to permit legislative reconsideration has

passed without corrective legislative action, the inference of legislative acquiescence limits judicial authority to reconsider the merits of its earlier decision. *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 297–98, 695 A.2d 1051 (1997); see *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 196, 676 A.2d 831 (1996); *White* v. *Burns*, 213 Conn. 307, 333–34, 567 A.2d 1195 (1990); *Herald Publishing Co.* v. *Bill*, 142 Conn. 53, 63, 111 A.2d 4 (1955). In this context, only "the most cogent reasons and inescapable logic"; *Jolly, Inc.* v. *Zoning Board of Appeals*, supra, 196; can justify judicial abandonment of judicial precedents dating back more than eighty years. See *Thompson* v. *Twiss*, 90 Conn. 444, 447, 97 A. 328 (1916).

We can perceive no such cogent reasons or inescapable logic to justify altering our long-standing judicial interpretation of one of the fundamental premises of our workers' compensation statute. This is particularly true for this statute, which has been the subject of extensive legislative amendment over its entire life, without any legislative indication of disagreement with the right to control test. Furthermore, it is fair to assume that employers and insurers have relied justifiably on that interpretation in ordering their business affairs. For us to abandon that interpretation would upset their legitimate expectations.

B

Recognizing that these principles create obstacles to judicial reconsideration of our long-standing "right to control" test, Hanson attempts a bypass, arguing that the "relative nature of the work" test can coexist with the "right to control" test. We disagree.

The "relative nature of the work" test determines the relationship between a worker and a putative employer by asking whether the worker's performance is an integral part of the regular business of the putative

employer. 3 A. Larson & L. Larson, Workmen's Compensation (1997) § 45.00, p. 8-193. The "right to control" test determines the same relationship by asking whether the putative employer has "the right to control the means and methods" used by the worker in the performance of his or her job. *Hunte* v. *Blumenthal*, 238 Conn. 146, 154, 680 A.2d 1231 (1996); *Silverberg* v. *Great Southwest Fire Ins. Co.*, 214 Conn. 632, 639, 573 A.2d 724 (1990); *Ross* v. *Post Publishing Co.*, supra, 129 Conn. 567.

Dual standards for determining whether a worker is an employee or an independent contractor would complicate the administration of our workers' compensation system. Although there well may be circumstances under which the results reached by application of the two tests will be identical, more often than not the results will differ. In all probability, a workers' compensation commissioner applying the "relative nature of the work" test would be required to broaden the class of "employees" to include workers who currently are characterized as independent contractors. See, e.g., *Harger* v. *Structural Services, Inc.*, 121 N.M. 657, 916 P.2d 1324, 1329–31 (1996). Indeed, unless differing results were contemplated, there would be little to gain from adopting a new test. Hanson has proffered no criteria to define the underlying circumstances under which one or the other test would be the more appropriate. If a workers' compensation commissioner had undefined and hence unlimited authority to invoke either test, the scope of the term "employee" would be left in confusion. We are persuaded, therefore, that we must evaluate Hanson's argument in favor of the "relative nature of the work" test as an outright alternative to the "right to control" test.[6]

---

[6] Hanson's argument relies on four out-of-state cases that we find unpersuasive. See *Stampados* v. *Colorado D. & S. Enterprises*, 833 P.2d 815, 817 (Colo. App. 1992); *Kertesz* v. *Korsh*, 296 N.J. Super. 146, 152–55, 686 A.2d 368 (App. Div. 1996); *Claim of Griffin*, 466 N.W.2d 148, 150 (N.D. 1991);

C

We turn now to the merits of replacing the "right to control" test with the "relative nature of the work" test. As advocated by Hanson, the "relative nature of the work" test would require a two part analysis, each part requiring consideration of three separate factors. With respect to the character of the work performed, the claimant would be required to show: (1) the degree of skill involved; (2) the degree to which the work is a separate calling or business; and (3) the extent to which a worker so situated reasonably can be expected to carry the burden of accident. With respect to the relationship of the work to the putative employer's business, the claimant would have to establish: (1) the extent to which the work is a regular part of the putative employer's regular business; (2) the extent to which the work is being performed continuously or intermittently; and (3) the extent to which the work is of sufficient duration to constitute continuing services rather than a particular assignment. See 3 A. Larson & L. Larson, supra, § 43.51, p. 8-23, and § 45.10, p. 8-193.[7]

*Kaiel* v. *Cultural Homestay Institute*, 129 Or. App. 471, 477, 879 P.2d 1319, rev. denied, 320 Or. 453, 887 P.2d 792 (1994).

[7] As Metro observes, although Professor Larson's treatise describes the "relative nature of the work" test as a new test currently superseding the "right to control" test, that statement no longer reflects the totality of the relevant case law. Earlier editions of his celebrated work demonstrate that, for almost thirty years, Professor Larson has been a staunch advocate of the "relative nature of the work" test. During this time period, however, only a few state courts have adopted this test in substitution for the "right to control" test. See, e.g., cases cited in footnote 6 of this opinion. Connecticut has not done so, either by way of legislation or by way of judicial opinion. See *DaSilva* v. *Danbury Publishing Co.*, 39 Conn. App. 653, 656, 666 A.2d 440, cert. denied, 235 Conn. 936, 668 A.2d 374 (1995). Connecticut is not alone. See, e.g., *Kirkwood* v. *Industrial Commission*, 84 Ill. 2d 14, 23–24, 416 N.E.2d 1078 (1981); *Youngblood* v. *North State Ford Truck Sales*, 87 N.C. App. 35, 37–38, 359 S.E.2d 256 (1987), aff'd, 321 N.C. 380, 364 S.E.2d 433 (1988). A contrary decision by the Supreme Court of Maine; *Timberlake* v. *Frigon & Frigon*, 438 A.2d 1294, 1297–98 (Me. 1982); was overturned five years later by that state's legislature. See *West* v. *C.A.M. Logging*, 670 A.2d 934, 937 n.2 (Me. 1996).

Hanson advances four arguments in favor of adoption of the "relative nature of the work" test. She derives three of these arguments from the unchallenged proposition that workers' compensation is social legislation. In that light, she argues that, in preference to the "right to control" test, the proposed test: (1) more effectively implements the objectives of this social legislation; (2) more accurately depicts the employer-employee relationship by precluding employer reliance on contracts drafted to avoid the costs of this social legislation; (3) more directly advances the remedial purposes of social legislation. In addition, she argues that the "right to control" test is too vague to be applied fairly. We are not persuaded. Evaluation of Hanson's first three arguments cannot be undertaken by this forum; their resolution is grist only for the legislative mill. Hanson's final argument is unpersuasive on its merits.

In the absence of any claim of constitutional vagueness in the "right to control" test, Hanson must demonstrate that fact-finding under this test exceeds the discretionary authority normally afforded to any trier of fact. Undeniably, whenever the parties disagree, a determination of fact has elements of uncertainty. Hanson has not shown that, in application, the "right to control" test has created more uncertainty than factual disputes about, for example, contractual intent or tortious misbehavior. Indeed, as is illustrated by the Alaska case upon which Hanson relies, close questions of fact are also likely to arise in the application of the "relative nature of the work" test. *Grothe* v. *Olafson*, 659 P.2d 602, 606 (Alaska 1983).[8]

---

[8] The relationship between the parties in this case illustrates the factual uncertainties that may arise in the application of the "relative nature of the work" test. Concededly, the decedent was free to use his taxicab for private engagements entirely unrelated to the business of Metro. Would the decedent's status depend on whether, when he was killed, he was engaged in business obtained through Metro's dispatcher or through his own enterprise? Would the status of other taxi drivers who were accidently injured depend

## II

The second issue raised by Hanson's appeal is whether, if the "right to control" test applies, the trier of fact improperly determined that the decedent was not an employee at the time of his death. She claims that Metro retained enough authority over the taxicab fleet bearing its name to demonstrate a right to general control that made the decedent its employee rather than an independent contractor. We disagree.

"The determination of whether an injury arose out of and in the course of employment is a question of fact for the commissioner." *Spatafore* v. *Yale University*, 239 Conn. 408, 418, 684 A.2d 1155 (1996). Accordingly, we apply the same deferential standard of review that we accord to findings of fact by a trial judge or jury. Id., 419. Keeping these principles in mind, we turn to Hanson's claim that Metro retained sufficient control to render her decedent an employee.

For Connecticut authority, Hanson relies principally on *Lassen* v. *Stamford Transit Co.*, 102 Conn. 76, 128 A. 117 (1925), a case which, like this one, involved the "right to control" test for taxicab drivers, and which held that the drivers were employees. That case, however, is distinguishable on its facts. For example, the taxicab company in that case required drivers to turn over their fares to the company and paid the drivers 75 percent of that amount. Id., 79. Furthermore, company dispatchers designated the driver who was to transport any particular passenger. Id., 78–79. In this case, Metro took care to avoid such indicia of control, leaving it to taxicab drivers like the decedent to decide, in the

---

solely, or principally, on the percentage of the time that they used the taxicab for Metro business? We do not suggest that these questions are unanswerable. They illustrate, however, that there will be close issues of fact, whichever test is applied.

exercise of their own discretion, when and where they would take the taxicabs on the road.

As a more general matter, Hanson cites the fact that Metro required cabdrivers to conform to department of transportation regulations with respect to such matters as licenses, meters, fares, records, dispatch and safety. The argument that such state regulatory requirements automatically satisfy the right to control test would make irrelevant the contractual terms of the relationship between the parties. It is axiomatic that every taxicab company must comply with state regulations. We are not persuaded, therefore, that Metro's requirement that owner-operators comply with government regulations definitively demonstrates an employer-employee relationship. See, e.g., *La Grande v. B & L Services, Inc.*, 432 So. 2d 1364, 1366 (Fla. App. 1983).

Contrary to Hanson's argument, we agree with the Appellate Court, the board and the commissioner that the totality of the evidence did not demonstrate that Metro had retained sufficient control to require a finding of an employer-employee relationship between Metro and the decedent. True, the commissioner made some subordinate factual findings that, if viewed in isolation, might have supported a different determination. For example, Metro required its drivers to: (1) report all traffic violations to Metro; and (2) obtain Metro's approval of any outside insurance. Metro also held legal title to the vehicles, and painted and marked the cars as Metro cabs. Other subordinate findings by the commissioner, however, paint a clearer picture of the contractual relationship between Metro and its drivers. In the daily use of their cabs, drivers could set their own hours, work anywhere in the Metro service area, refuse to accept dispatch calls,[9] and hire a second driver for

___

[9] Contrary to the implied assertion of Justice Berdon's dissenting opinion, Metro could not order a driver to take radio dispatch calls. Metro dispatched

the cab. Drivers had sole responsibility for all expenses related to operation of their cabs and had the right to regain total ownership rights to their cabs upon the termination of their relationship with Metro. Administratively, moreover, Metro did not pay any salary or fringe benefits to the drivers and did not require the drivers to report their fares to Metro. We conclude that the commissioner reasonably found that the totality of factors in this case indicates that Metro taxi drivers were not employees as that term is used under the act.[10]

In sum, the Appellate Court properly reviewed the commissioner's determination under the terms of the "right to control" test. We concur in the Appellate Court's conclusion that, under the circumstances of this case, Hanson's decedent was not an employee, but, rather, an independent contractor.

## III

The third and final issue raised by Hanson's appeal is whether the commissioner improperly refused to amend its findings to include certain requested additions of fact. We agree with the Appellate Court's resolution of this issue.[11] Once it has been decided that the appropriate test is the "right to control" test, "even if

---

drivers who agreed to be available *ad hoc*; it could not prevent a driver from sharing a car with other drivers.

[10] The principal issue was the propriety of a motion to correct to add a finding that, on the date of his death, the decedent was on the road in response to a call that he had received from Metro's radio dispatcher. There was, however, neither a finding, nor a request to add a finding, to the effect that the decedent had used his taxicab exclusively or even predominantly in response to calls from the dispatcher. Significantly, the commissioner found that the decedent had used his own cellular phone for servicing customers and that he had shared the use of his cab with a second driver. Furthermore, in one of the requests for correction of the finding, Hanson herself asked for inclusion of a finding that: "The work performed by [the decedent] was not for the completion of a particular job but consisted of an ongoing relationship between [the decedent] and [Metro]."

[11] In reaching its conclusion, the Appellate Court concurred in the reasoning of the board.

the findings were corrected as requested, the ultimate conclusion would not change." *Hanson* v. *Transportation General, Inc.*, supra, 45 Conn. App. 447.

The judgment of the Appellate Court is affirmed.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

BERDON, J., dissenting. The majority, in applying the right to control test in determining whether the deceased husband (decedent) of the plaintiff Janet Hanson was an employee within the meaning of the Workers' Compensation Act (act), General Statutes § 31-275 et seq., ignores this court's long-standing precedent for determining whether there exists such a relationship. Furthermore, the majority's narrow interpretation of this remedial statute runs contrary to our fundamental principle that the act "must be interpreted liberally to achieve its humanitarian purposes . . . [and] this court should not impose limitations on the benefits provided for a . . . worker that the statute itself does not clearly specify." (Citations omitted; internal quotation marks omitted.) *Gil* v. *Courthouse One*, 239 Conn. 676, 682–83, 687 A.2d 146 (1997). Today, the majority, by failing to recognize this precedent, allows the named defendant, Transportation General, Inc., doing business as Metro Taxi (Metro), to contract out the very heart of its business for the purposes of avoiding social legislation put in place to protect employees and their families.[1]

---

[1] Professor Arthur Larson points out in his comprehensive treatise on workers' compensation that: "With the advent of social and labor legislation, chain store taxation, and other modern enactments drawing a distinction between independent contractors and employees, there has been an increasing effort on the part of employers to avoid both the financial cost and the bookkeeping and reporting inconvenience that goes with workmen's compensation, unemployment compensation, social security, and the like." 3 A. Larson & L. Larson, Workmen's Compensation (1997) § 45.10, p. 9. Today's decision effectively insulates Metro, the operator of a fleet of taxi-

Nevertheless, even if we should interpret the act narrowly—that is, focus on whether, at the time of the decedent's death, Metro retained the right to control the decedent with respect to the performance of his services as a taxicab operator—the plaintiff is entitled to workers' compensation benefits as the widow of the decedent because, as I point out in part II of this dissent, Metro admitted that the decedent was under its direction at the time of his death. The majority fails to address this claim because, in focusing on whether this court should adopt the relative nature of the work test as an alternative test for the purpose of determining whether a claimant is an employee under the act, it appears to have lost sight of the proverbial forest.[2]

Indeed, the majority, in footnote 5 of its opinion, without citing to any supporting authority, characterizes the issue in this appeal as follows: "[W]hat the decedent driver knew or should have known of his own status under the act." Such a characterization is absurd because the issue in any workers' compensation case in which the employment status of the claimant is contested is whether the defendant had the right to control the claimant with respect to the performance of his services. If the issue was what the claimant knew of his own status, many employees who allegedly do not know, or should not have known of their employment status, could avoid the exclusivity provision of the act[3] and bring an action in tort against their employers.

cabs that relies almost exclusively on taxicab drivers like the decedent to carry out its business, from the legal requirements of unemployment compensation and social security legislation as well as workers' compensation legislation.

[2] See part II of this dissent; see part III of the majority opinion, which summarily rejected this claim, as did the Appellate Court, without even identifying what findings the plaintiff was attempting to add to the compensation commissioner's findings.

[3] General Statutes § 31-284 (a), the exclusivity provision of the act, provides in relevant part: "All rights and claims between an employer who complies with the requirements of subsection (b) of this section and employ-

By losing sight of the real issue in this case, the majority deprives the plaintiff of her just compensation.

I

Reversal is required in this case because the compensation commissioner for the third district (commissioner) did not properly review all the circumstances of the decedent's work relationship to determine whether he was an employee or an independent contractor. The act does not specifically set forth the factors to consider in determining whether a claimant was an employee. General Statutes § 31-275 (9) (A) (i) defines an employee for purposes of the act to mean any person who "[h]as entered into or works under any contract of service or apprenticeship with an employer . . . ." When the state adopted the act in 1913, this court's determination of whether there existed an employer-employee relation was dependent on the traditional common-law right to control test. See *Thompson* v. *Twiss*, 90 Conn. 444, 447, 97 A. 328 (1916), citing *Alexander* v. *Sherman's Sons Co.*, 86 Conn. 292, 297, 85 A. 514 (1912), and *Norwalk Gaslight Co.* v. *Norwalk*, 63 Conn. 495, 28 A. 32 (1893) (pivotal question is "who has the right to direct what shall be done and when and how it shall be done? [In other words] [w]ho has the right to the general control?"). In 1933, when the American Law Institute adopted the right to control test for determining the existence of a master-servant relationship, it recognized that many factors were germane in determining whether that relationship exists. 1 Restatement, Agency § 220 (1933). Soon thereafter, this court acknowledged that it looked to the

---

ees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter, provided nothing in this section shall prohibit any employee from securing, by agreement with his employer, additional compensation from his employer for the injury or from enforcing any agreement for additional compensation."

Restatement when it applied the right to control test to determine whether a claimant was an employee. *Northwestern Mutual Life Ins. Co.* v. *Tone*, 125 Conn. 183, 190, 4 A.2d 640 (1939) ("Various elements may enter into the determination of the question whether one who performs services for another is his servant or is exercising an independent employment. Restatement, 1 Agency, 220."); see also *Robert C. Buell & Co.* v. *Danaher*, 127 Conn. 606, 610, 18 A.2d 697 (1941) (same).[4]

The Restatement (Second) of Agency, § 220 (1958) (hereinafter referred to as § 220), which is substantially the same as its predecessor,[5] defines the relationship of master and servant as follows: "(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered; (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer of the workman supplies the instrumentalities, tools, and the place of work

[4] "[T]he word 'employee' has largely displaced 'servant' . . . [in modern social legislation. Whether it is] the usual Employers' Liability Acts [or] the Workmen's Compensation Acts the tests given in [§ 220] for the existence of the relation of master and servant are valid." 1 Restatement (Second), Agency § 220 (1) (g), comment (1958).

[5] Section 220 of the first Restatement is identical in all respects to § 220 of the Restatement (Second), except for the addition of factor (j) in subsection 2 of the Restatement (Second).

for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business."

When the claimant proves, pursuant to § 220 (1), that the purported employer had a right to control the person's work, the analysis stops there and the employment relationship for purposes of the act has been satisfied. The "relation of master and servant is one not capable of exact definition. It cannot . . . be defined in general terms with substantial accuracy." 1 Restatement (Second), supra, § 220, comment (1) (c). "Many factors are ordinarily present for consideration, no one of which is, by itself, necessarily conclusive." *Bourgeois* v. *Cacciapuoti*, 138 Conn. 317, 321, 84 A.2d 122 (1951). Indeed, the Restatement recognizes, as we have, that "[a]lthough control or right to control the physical conduct of the person giving service is important and in many situations is determinative, the control or right to control needed to establish the relation of master and servant may be very attenuated."[6] 1 Restatement (Second), supra, § 220, comment (1) (d). Therefore, when subsection (1) does not definitively establish the employer-employee relationship, triers of

---

[6] For example, "[i]n some types of cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control. Thus, the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking." 1 Restatement (Second), supra, § 220, comment (1) (d); see also *Hannigan* v. *Goldfarb*, 53 N.J. Super. 190, 196–97, 147 A.2d 56 (App. Div. 1958) ("[w]hen the manner of performing the service is beyond another's control because of its nature, absence of direct control over such details may become insignificant in the overall view of the facts . . . especially . . . where . . . [the state by regulation] licenses the [taxi] drivers and tells them how to behave, under pain of losing their licenses" [citations omitted; internal quotation marks omitted]).

fact *must consider all the factors* in § 220 (2), and then determine "whether or not there is a sufficient group of favorable factors to establish" that the claimant is an employee. Id., § 220, comment (1) (c). For example, "[w]hile the method of paying by the hour or day rather than by a fixed sum is characteristic of the relationship of employer and employee, it is not decisive. *Thompson* v. *Twiss*, supra, [90 Conn.] 448; *Stier* v. *Derby*, 119 Conn. 44, 52, 174 A. 332 [1934]. Nor is it decisive that the injured party uses his own tools and equipment." *Bourgeois* v. *Cacciapuoti*, supra, 321; see *Ceradsky* v. *Mid-America Dairymen, Inc.*, 583 S.W.2d 193, 196 (Mo. App. 1979) ("[w]here the evidence lacks such a conclusiveness, however, whether the one who renders the service for the other acts as employee or independent contractor depends upon *all the circumstances of the work relationship*—so that control becomes only one indicium weighted with the several others to determine the true status" [emphasis added]).

On the basis of the undisputed findings by the commissioner in this case, I conclude that Metro's right to control the decedent was not so attenuated as to mandate a finding, under subsection (1) of § 220, that the decedent was an independent contractor. Therefore, consideration of all the factors in subsection (2) of § 220 is required to determine the true status of the decedent at the time of his fatal injury. The majority, like the commissioner, however, limits its review of the decedent's relationship to a summary analysis of some, but not all, of the factors set forth in § 220 (2).

In general, the "inquiry [into all the factors of subsection (2) of § 220] turns to the economic and functional relationship between the nature of the work and the operation of the business served." *Ceradsky* v. *Mid-America Dairymen, Inc.*, supra, 583 S.W.2d 199. Several factors in § 220 (2) specifically focus on the relative

nature of the claimant's work. For instance, subsection (2) (b) requires us to take into consideration whether the decedent was engaged in a distinct occupation. "It would appear that to truly be independent contractors, [Metro's] drivers are required [to have a certificate of operation issued by the state department of transportation] . . . in order to present themselves as a business entity." *Petition of City Cab of Manchester*, 139 N.H. 220, 222, 652 A.2d 1202 (1994). The owner-operator agreement signed by the decedent provides that he "acknowledges that he has acquired no property rights in . . . [the] certificate to operate . . . assigned to him by [Metro] during the term of this Agreement . . . ." Moreover, Metro's drivers do not present themselves as being separate business entities. Indeed, at the time of the decedent's injury, he was operating a vehicle painted orange and white—like all other Metro taxicabs—and emblazoned with the Metro name and telephone number. Consequently, most of Metro's customers "would have no reason to suspect that a driver was a business entity distinct from [Metro]." Id., 223. Under these circumstances, it cannot reasonably be said that the decedent was engaged in an occupation distinct and separate from that of a Metro taxicab operator.

Most importantly, the Restatement directs this court to consider whether the decedent's work was "a part of the regular business of the employer."[7] 1 Restatement (Second), supra, § 220 (2) (h). In this case, Metro's sole business was to supply taxi service, precisely what the decedent was doing as a result of his employment by Metro. Indeed, pursuant to Metro's owner-operator

---

[7] "That is to say, on analysis, the right to control the detail of the work factor given predominance as proof of the employee status shows through as merely an euphemism for worker activity of such a nature as to be a regular and continuous part of the manufacture of the product or other service." *Ceradsky* v. *Mid-America Dairymen, Inc.*, supra, 583 S.W.2d 198.

agreement, the decedent was hired to perform a continual service of carrying passengers to and from points in Metro's area of operations[8] in order to ensure fulfillment of Metro's obligations to the department of transportation to provide a quality taxicab service meeting certain standards. Although Metro argued before the commissioner that it was in the business of "leasing cars to drivers," Metro was obligated to provide taxi service in accordance with its franchise with the department of transportation. In doing so, Metro received telephone calls from customers for taxi service and dispatched drivers, including the decedent, to these customers. While Metro adopted an ingenious method of fixing the decedent's compensation and permitted him to exercise much discretion over the use of his taxicab, there was, still, "a continuous, essential connection between [Metro's] work and that of the [decedent] . . . making the [decedent's] labor a critical part of the regular business of [Metro]." (Citations omitted; internal quotation marks omitted.) *Petition of City Cab of Manchester*, supra, 139 N.H. 222; *Aisenberg* v. *C.F. Adams Co.*, 95 Conn. 419, 422, 111 A. 591 (1920) ("[t]he means and method of conducting this business, as we have in part detailed, comprise the essence of this business").

This last factor, § 220 (2) (h), is closely related to the "relative nature of the work" test that the plaintiff urges this court to adopt and that has been embraced by other jurisdictions. See, e.g., *Stampados* v. *Colorado D. & S. Enterprises*, 833 P.2d 815, 817 (Colo. App. 1992); *Ceradsky* v. *Mid-America Dairymen, Inc.*, supra, 583 S.W.2d 193; *Petition of City Cab of Manchester*, supra, 139 N.H. 221; *Kertesz* v *Korsh*, 296 N.J. Super. 146, 153,

---

[8] Metro was awarded a certificate to operate 109 taxicabs by the department of transportation for the transportation of passengers within and between the cities of New Haven, East Haven, West Haven, Hamden and Woodbridge.

686 A.2d 368 (App. Div. 1996); *Claim of Griffin*, 466 N.W.2d 148, 150 (N.D. 1991); *Kaiel* v. *Cultural Homestay Institute*, 129 Or. App. 471, 477, 879 P.2d 1319 (1994).

It is unnecessary for this court to consider the issue of adopting the relative nature of the work test in order to decide this case because, according to our precedent, most of the factors of this test have relevance in the application of the right to control test.[9] For example,

[9] The final factor of the relative nature of the work test, the degree to which a worker so situated reasonably can be expected to carry the burden of the accident, is not comparable to any of the factors of § 220 (2), but it is clearly in keeping with the well recognized purposes of workers' compensation legislation.

"As an integrated system of social welfare legislation, [workers'] compensation embodies two principal and unique social policy purposes. These can be characterized as the social bargain and social insurance purposes. The first of these is related to the immediate impetus for the adoption of this legislation. The impetus, of course, was to alleviate the plight of injured workers who often suffered without remedy under the common law. This purpose has been characterized as ' . . . a socially-enforced bargain which compels an employee to give up his valuable right to sue in the courts for full recovery of damages . . . in return for a certain, but limited, award. It compels the employer to give up his right to assert common-law defenses in return for assurance that the amount of recovery by the employee will be limited.' " D. Samuelsen, "Employee or Independent Contractor: The Need For a Reassessment of the Standard Used Under California's Workmen's Compensation," 10 U.S.F.L. Rev. 133, 136–37 (1975); see *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 97, 491 A.2d 368 (1985) (the act establishes, as part of on-going social compact, system that "compromise[s] an employee's right to a common law tort action for work related injuries in return for relatively quick and certain compensation").

"The second principal social policy purpose [is] the social insurance form through which workmen's compensation [is] to operate. This would be its risk distribution aspect. The fact that modern industrial life will inevitably generate work-related injuries and possibly death is one of the major premises underlying workmen's compensation." D. Samuelsen, supra, 10 U.S.F.L. Rev. 137. "The law was intended for the protection of workmen and their families; it was intended to afford machinery by which the burdens of injuries sustained by those who do the actual work of a business, and are not themselves employers with a duty of insurance under the act, may be socially distributed and borne by society in general." *Matter of Rheinwald* v. *Builders' Brick Supply Co.*, 168 App. Div. 425, 440, 153 N.Y.S. 598 (1915).

The plaintiff's decedent took a regular and continuous part in the defen-

in *Higley* v. *Woodford*, 106 Conn. 284, 285–86, 137 A. 755 (1927), this court specifically relied on the following factor—the degree to which the claimant's work is a separate calling or business—to conclude that the claimant woodcutter was not an employee of the defendant. The court in *Higley* emphasized that because the claimant was " 'exercising an independent employment . . . was doing his own business . . . in his own way and under his own will' " he was an independent contractor. Id. Most importantly, in at least two cases this court has relied on the extent to which the work is a regular part of the purported employer's regular business to determine whether a claimant was an employee or an independent contractor. See, e.g., *Robert C. Buell & Co.* v. *Danaher*, supra, 127 Conn. 612 (claimant was employee because " '[o]n the whole the work which the salesmen are doing is the business of the plaintiff [and t]he advancement of that business depends very largely upon the method and manner of the doing of their work by the salesmen' "); *Lassen* v. *Stamford Transit Co.*, 102 Conn. 76, 81, 128 A.2d 117 (1925) (negligent operator of taxicab was employee of defendant who had concession for operating taxi service, in part, because defendant had no "other means of performing this service").[10]

dant's economic activity of providing taxi service to residents of and visitors to the New Haven metropolitan area. Like many of Metro's other drivers, the decedent and his family could not be expected to bear the cost of a serious traffic accident, nor was his place in the overall transportation business such that he could distribute the risk of injury on his own. In every respect then, he is the kind of worker for whose benefit the compensation act was thought necessary. *Shinuald* v. *Mound City Yellow Cab Co.*, 666 S.W.2d 846, 849 (Mo. App. 1984) ("It is a business of the [company] to supply taxicab service to the customers . . . . There is substantial evidence that claimant's work was a regular and continuous part of that business and not an independent business through which it would be feasible to channel the cost of work-connected injury. . . . Therefore, [the] claimant is a fortiori an employee for purposes of the Workers Compensation Law." [Internal quotation marks omitted.])

[10] By implication, if the defendant in *Lassen* did not have any other means of providing taxi service to its customers, the taxicab operator's work was

II

In my view, reversal of the commissioner's decision is also required because he failed to include in his findings material undisputed facts that clearly would have established an employer-employee relationship. It is well settled law that the "finding [of the commissioner] cannot be changed unless the record discloses that the finding includes facts found without evidence or fails to include material facts which are admitted or undisputed." *Wheat* v. *Red Star Express Lines*, 156 Conn. 245, 248, 240 A.2d 859 (1968). Moreover, "[t]he conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Fair* v. *People's Savings Bank*, 207 Conn. 535, 539, 542 A.2d 1118 (1988).

As previously pointed out, the undisputed facts found by the commissioner provided sufficient proof of the decedent's employee status. Nevertheless, when the findings requested by the plaintiff, based upon Metro's own admission before the commissioner, are added to the commissioner's findings, the evidence is overwhelming that the decedent was an employee of Metro at the time of his fatal injury. The commissioner found that "[w]hen a driver agreed to service a call through the radio dispatcher he was under the orders and direction of the dispatcher." After the commissioner released its decision, the plaintiff requested that he amend this finding to include the following facts: "[The decedent] always utilized the radio dispatch service [of Metro] and at the time of his death, he was responding to a radio dispatch call [from Metro] and was under orders

a regular part of the defendant's business, and, consequently, was a good indication that the defendant was the operator's employer.

and direction of the dispatcher."[11] The transcript of the hearing before the commissioner reflects that the defendant had conceded that the decedent utilized the services of the dispatcher "most of the time" he operated the taxicab, and that he was "utilizing it for at least some of the night [he was killed] because the people who killed him were a radio dispatched call."[12] Remarkably, the majority concludes, without specific reference or identification of the requested finding, that even if the commissioner had granted the plaintiff's request to correct this and fifteen other findings, " 'the ultimate conclusion [that the decedent was not an employee] would not change.' "

Clearly, if the decedent was responding to Metro directed dispatches on the night he was murdered, he was "under the orders and direction of" Metro and for that time, at least, he was under the direct control of Metro in full satisfaction of § 220 (1). The majority seems to hold that for the decedent to qualify for workers' compensation benefits he must have worked exclusively or predominantly for Metro. This requirement is contrary to our long-standing rule of law that "[a] person may be a contractor as to part of his service and a servant as to another part . . . [and that] *the question*

---

[11] Incredibly, the majority concludes that the plaintiff's request to add a finding that the decedent "always utilized the radio dispatch service" is not a "request to add a finding, to the effect that the decedent had used his taxicab exclusively or even predominantly in response to calls from the dispatcher." Clearly, if the decedent *always* used the dispatch service, he used his taxicab exclusively or predominantly in response to calls from the dispatcher.

Moreover, contrary to the majority's suggestion, the plaintiff's request to add a finding that the work performed by the decedent "consisted of an ongoing relationship between [him] and [Metro]" buttresses her claim that the decedent was an employee of Metro. If the decedent, as part of his ongoing relationship with Metro, always utilized the radio dispatch service, then he was under the direction and control of Metro whenever he transported passengers in his taxicab.

[12] See testimony of William Scalzi, Metro's president.

*of compensability [under the act] is determined by the particular relationship existing at the time the injury was suffered.*" (Citation omitted; emphasis added.) *Clough* v. *Estate of Malley*, 126 Conn. 379, 382, 11 A.2d 398 (1940); *Spring* v. *Constantino*, 168 Conn. 563, 573–75, 362 A.2d 871 (1975) (public defender is employee of state for certain purposes, and independent contractor for other purposes); *Scorpion* v. *American-Republican, Inc.*, 131 Conn. 42, 45, 37 A.2d 802 (1944) (issue for jury was whether newsboys were agents of defendant, or independent contractors as to removal of wires from stacks of delivered papers); *Markham* v. *Middletown*, 102 Conn. 571, 574, 129 A.2d 524 (1925) (town tree warden, as independent contractor, was acting as employee of town when he was injured removing limbs from tree on public property); see also 1 T. Shearman & A. Redfield, Negligence (6th Ed. 1913) § 165 ("[o]ne who has an independent business, and generally serves only in the capacity of a contractor, may abandon that character for a time, and become a mere servant or agent, and this, too, without doing work of a different nature from that to which he is accustomed"). Moreover, by Metro's own admission and the commissioner's finding, "most of the time" Metro's dispatcher exercised direct control over the decedent.[13]

Furthermore, even when the decedent operated the taxicab at his own discretion, Metro retained the right to exercise control over him. "It is not the fact of actual interference with control but the right to interfere which makes the difference between an independent contractor and a servant or agent." (Internal quotation marks omitted.) *Kaliszewski* v. *Weathermaster Alsco Corp.*,

---

[13] I agree with the majority's statement in footnote 9 of its opinion that "Metro could not order a driver to take radio dispatch calls." When, however, the decedent did respond to dispatched calls, which according to Metro was "most of the time," he was under the direction and control of the dispatcher.

148 Conn. 624, 629, 173 A.2d 497 (1961). The conclusion that Metro had a right to control the decedent is supported by the fact that it had the right to terminate the decedent's owner-operator agreement—the agreement that was the foundation of Metro's business, and that required each owner-operator to: (1) maintain a neat and clear appearance at all times while on duty; (2) exercise courtesy and consideration and help passengers load and unload baggage; (3) use the shortest available route to the passenger's destination, or as directed by the passenger; and (4) follow all relevant department of transportation regulations. See *Lassen* v. *Stamford Transit Co.*, supra, 102 Conn. 80–81 ("it must be implied that the company directed and required its drivers to conform to these methods of dealing with the company's customers"). Nevertheless, even if Metro never disciplined drivers who did not conform, the fact that it had the right to discipline those said drivers is "one of the strong indications that the relation is one of employment." (Internal quotation marks omitted.) *Aisenberg* v. *C.F. Adams Co.*, supra, 95 Conn. 423.

At the very least, because the commissioner omitted material facts from his findings, his conclusion that "the proof does not indicate that [Metro] had the degree of control necessary to show that [the decedent] was an employee of [Metro] on [the night he was killed]" is unreasonably drawn from the subordinate facts. Therefore, I would reverse the Appellate Court, and remand the case with instruction to remand the case to the review board and the commissioner for reconsideration in view of these material facts and any other fact which was admitted or undisputed.

Accordingly I dissent.